IN THE MATTER OF THE ATTORNEY FEES OF
SHELDON M. MEIZLISH

Opinion of the Court

1. Attorney and Client—Fees—Assigned Counsel—Indigents—
Criminal Law—Court Rules.

   System of compensation for attorney assigned to defend an
   indigent charged with a crime under a Wayne Circuit Court
   Rule is not irrational and does not promote assembly line
   justice as distinctions are made in the amount of money a
   lawyer receives if he conducts a preliminary examination as
   opposed to waiving a preliminary examination and additional
   fees are granted if a case is appealed to a higher court
   (Wayne Circuit Court Rule 14.13).

2. Attorney and Client—Fees—Assigned Counsel—Indigents—
Criminal Law—Court Rules.

   Wayne Circuit Court Rule regarding compensation for an at-
   torney assigned to defend an indigent charged with a crime
   does, in general, provide reasonable compensation for court
   appointed attorneys for indigents (Wayne Circuit Court Rule
   14.13).

3. Attorney and Client—Fees—Assigned Counsel—Criminal
Law—Constitutional Law—Due Process—Equal Protection.

   An attorney was not deprived of due process and equal protec-
   tion under the United States and Michigan Constitutions where

References for Points in Headnotes

[1–3, 6, 10–15] 7 Am Jur 2d, Attorneys at Law § 207.
   Construction of state statutes providing for compensation of at-
   torney for services under appointment by court in defending
   indigent accused, 18 ALR3d 1074.
   Right of attorney appointed by court for indigent accused to and
   court's power to award, compensation by public, in absence of
   statute or court rule, 21 ALR3d 819.
[4, 5, 7] 21 Am Jur 2d, Criminal Law §§ 318–323.
[8, 9] 7 Am Jur 2d, Attorneys at Law § 203 et seq.

he was assigned to represent an indigent defendant in a criminal case for post-conviction and appellate proceedings, he requested the trial court for a fee for his services, an award of a fee was made, and the attorney, being dissatisfied with the amount, filed a motion for rehearing which was denied (US Const, Am XIV; Const 1963, art 1, §§ 2, 17).

4. CONSTITUTIONAL LAW—INDIGENTS—ATTORNEY AND CLIENT.

An indigent defendant is not deprived of his constitutional rights by the appointment of unpaid counsel as dedication and diligence to a client's cause should not be altered because of the payment of a higher fee and most attorneys are dedicated and will zealously protect the rights of any client they defend.

5. CRIMINAL LAW—CONSTITUTIONAL LAW—INDIGENT DEFENDANTS—ATTORNEY AND CLIENT.

An indigent defendant in a criminal case was not denied his constitutional right of representation by counsel where he was provided with the services of three attorneys for post-conviction and appellate proceedings, the first two were permitted to withdraw, and the third attorney was then appointed.

6. ATTORNEY AND CLIENT—INDIGENTS—CRIMINAL LAW—COURT RULES—CONSTITUTIONAL LAW—DUE PROCESS—EQUAL PROTECTION.

Wayne Circuit Court Rule providing compensation for an attorney assigned to defend an indigent charged with a crime is not arbitrary and capricious and does not violate the attorney's rights under the due process and equal protection clauses of the United States Constitution or the Michigan Constitution (US Const, Am XIV; Const 1963, art 1, §§ 2, 17; Wayne Circuit Court Rule 14.13).

DISSENTING OPINION
BLACK, J.

7. ATTORNEY AND CLIENT—INDIGENTS—CONSTITUTIONAL RIGHTS.

*Experience has shown that forcing a lawyer to do professional work on behalf of an indigent for little or no compensation results in the denial of the indigent's constitutional rights to adequate representation.*

8. COURTS—ATTORNEYS—COMPENSATION.

*The Michigan Supreme Court should proceed on its own motion, in the exercise of its inherent power to take such action as is reasonably necessary to fulfill its constitutional responsibility*

*for efficient judicial service, to establish a policy regarding adequate payment for lawyers appointed to represent the indigent.*

9. ATTORNEY AND CLIENT—PROFESSIONAL DUTY—COMPENSATION.

*The lawyer, by entering the legal profession, has rejected financial gain as his sole objective, and has voluntarily offered his capabilities and talents to the service of the public, but he is entitled to acquire proper tools for his work and an adequate standard of living for himself and his family.*

10. ATTORNEY AND CLIENT—COMPENSATION—INDIGENTS.

*A lawyer's professional time is a property right, and has been stolen from him when by compulsion of a judicial order he represents an indigent for an inadequate fee.*

11. ATTORNEY AND CLIENT—COMPENSATION—INDIGENTS—FAIRNESS—EQUALITY.

*Lawyers forced to serve the indigent in this state are not treated fairly or equally in the matter of compensation; much in that regard depends upon the varying attitudes of assigning trial judges.*

12. ATTORNEY AND CLIENT—COMPENSATION—INDIGENTS.

*The Michigan Supreme Court should not continue to require members of the Bar to absorb the cost of the defense of the indigent.*

13. ATTORNEY AND CLIENT—COMPENSATION—INDIGENTS.

*The circuit court should ascertain and order paid a reasonable fee for the services rendered by an attorney for the defense of an indigent, and the Michigan Supreme Court should immediately adopt a court rule comporting with a resolution of the Board of Commissioners of the State Bar that attorneys assigned to represent indigent defendants in criminal cases be compensated at the rate provided in the State Bar minimum fee schedule.*

DISSENTING OPINION

ADAMS, J.

14. ATTORNEY AND CLIENT — COMPENSATION — FEES—INDIGENTS — CRIMINAL LAW.

*The circuit court should ascertain and order paid a reasonable fee for the services rendered by an attorney for the defense of an indigent in a criminal case.*

15. ATTORNEY AND CLIENT—COMPENSATION—FEES—INDIGENTS.
   *Until there is a statewide adequate system for providing counsel for indigent defendants, responsibility for setting counsel's fees should be left with the judge who hears the case and is in a position to determine and set an adequate fee for the services performed.*

Appeal from Court of Appeals, Division 3, T. M. Burns, P. J., and R. B. Burns and Fitzgerald, JJ., denying application for leave to appeal from Wayne, Cornelia G. Kennedy, J. Submitted June 23, 1971. (No. 24 June Term 1971, Docket No. 52,830.) Decided April 6, 1972.

Motion by Sheldon M. Meizlish for attorney fees as assigned counsel for post-conviction and appellate proceedings for the defendant in People against Fred Clay. Fees awarded. Meizlish's motion for rehearing denied. Meizlish's application for leave to appeal to the Court of Appeals denied. Meizlish appeals. Affirmed.

*Sheldon M. Meizlish, in propria persona.*

*William L. Cahalan,* Prosecuting Attorney, and *Aloysius J. Suchy* and *Samuel J. Torina,* Assistant Prosecuting Attorneys, for Wayne County.

SWAINSON, J. On February 6, 1969, Fred Clay was convicted in Wayne County Circuit Court, upon a plea of guilty, of breaking and entering a business establishment with intent to commit the crime of larceny.[1] On March 3, 1969, he was sentenced to a term of not less than eight nor more than ten years. Defendant had been represented by Max M. Silverman, of the Defender's Office—Legal Aid and De-

---

[1] MCLA 750.110; MSA 28.305.

fender Association of Detroit, and that office was initially appointed to represent him for post-conviction and appellate proceedings. However, that office filed a motion to withdraw on the grounds that it could not "objectively review the validity and merits of a plea of guilty in which it participated and which, in the opinion of Max M. Silverman, was providently entered." The motion was granted on May 23, 1969, and on May 28, 1969, Sheldon M. Meizlish was appointed as substitute counsel for post-conviction and appellate proceedings. After a careful and considered review of the matter, Mr. Meizlish concluded there was no basis for any meaningful challenge of the conviction and, after securing the approval of defendant, filed a motion to withdraw. That motion was granted on September 5, 1969.

The defendant indicated that he still desired to challenge his conviction and in conformity with the requirements of *In re Hoffman*, 382 Mich 66 (1969), the court appointed David Eason as new counsel.

In seeking leave to withdraw, Mr. Meizlish followed the suggested procedure of the United States Supreme Court in *Anders v California*, 386 US 738; 87 S Ct 1396; 18 L Ed 2d 493 (1967). Mr. Meizlish requested a fee for his services and submitted to the court a detailed service voucher showing that he had spent 9–3/4 hours working on defendant's case.[2]

---

[2]

| "Date | Description of Service | Amount of Time |
|---|---|---|
| "June 24, 1969 | Drafting Stipulation and Order for extension of time to file post-conviction motions; obtaining approval of Chief Appellate Lawyer Torina; obtaining entry of Order | 1 hr. |
| "June 26, 1969 | Dictating memo re: conversation with Det. Everett Plumb, officer in charge of case. | 1/4 hr. |

The trial court agreed that the services claimed were reasonable and did not doubt that they were performed.

Wayne Circuit Court Rule 14.13[3] provides for compensation for assigned counsel. The trial court construed it to allow $50, and this amount was awarded to Mr. Meizlish. Mr. Meizlish was dissatisfied with the award and filed a motion for rehearing. The motion was denied on December 5, 1969. The Court of Appeals denied leave to appeal on April 16, 1970. We granted leave to appeal. 384 Mich 752.

Appellant states the issue as follows:

"Did Wayne County Circuit Court Local Rule 14.13 and the award for attorney fees in this case violate the Appellant's rights, under the Fourteenth Amendment of the Federal Constitution and Article I, Sections 2 and 17, of the State Constitution, to due process of law and equal protection of laws, and do they violate the right of every indigent defendant, particularly those who desire to institute post-conviction proceedings, to effective assistance of counsel, the right to an effective appeal, due process of law and equal protection of laws, in violation of Amendments 6 and 14 of the Federal Constitution and Article I, Sections 2, 17 and 20, of the State Constitution?"

| Date | Description of Service | Amount of Time |
|------|------------------------|----------------|
| "July 16, 1969 | Research; dictating letter to client. | 3 hrs. |
| "July 31, 1969 | Preparing Motion to Withdraw. | 2 hrs. |
| "Aug. 8, 1969 | At hearing on Motion to Withdraw; other work on file. | 1–1/2 hrs. |
| "Aug. 14, 1969 | Dictating letter to client, etc. | 1/2 hr. |
| "Aug. 25, 1969 | Dictating letter to client; dictating 'Report of Assigned Counsel'; dictating letter to Judge Kennedy. | 1–1/2 hrs. 9–3/4 hrs." |

[3] The present Wayne Circuit Court Rules became effective on November 1, 1970. At the time this action commenced the applicable rule was 14.5. Present rule 14.13 is identical to the previous rule 14.5.

Wayne Circuit Court Rule 14.13 provides:

"Any attorney assigned by a judge of this court to defend an indigent person charged with a crime, shall, before payment therefor, file with the Clerk a written statement that he has not received or been promised payment for [*sic*] any other source.

"On certification of the trial judge, such attorney shall be entitled to receive from the Wayne County Treasurer:

"(a) A fee not to exceed $50.00 for appearance by the attorney at arraignment on the warrant.

"(b) A fee for appearance by the attorney at the examination:

If Examination is waived, $50.00.

If Examination is adjourned at the request of the prosecutor or on Court's own motion, each adjournment, but not to exceed two adjournments, $50.00.

If Examination is conducted where testimony is taken or if Motion to Dismiss is granted for each day or portion thereof, $100.00.

"(c) A fee for appearance by the attorney at the arraignment in Circuit Court, $50.00.

"(d) A fee for preparation of case for trial in Circuit Court; defendant on bond, including plea, $100.00:

For preparation of case for trial in Circuit Court; If defendant is in jail and is interviewed by attorney at the jail, including plea, $125.00.

"(e) A fee for appearance on written Motion in Circuit Court when the Motion is actually argued; A fee of up to $50.00 to be awarded at the discretion of the judge hearing the Motion.

"(f) In addition, a fee for attendance in Circuit Court for Trial:

Cases in which the maximum penalty is life imprisonment, for each day or portion thereof, $150.00; All other cases, for each day or portion thereof, $100.00.

"(g) A fee for appearance at time of sentence, $50.00.

"(h) A fee for appearance at probation violation hearing; For each one-half day, $50.00.

"(i) A fee for appearance at sanity hearing, for each day or portion thereof, $100.00.

"(j) A fee for filing written Motion for new trial and arguing the same, filing of briefs thereof, etc., $50.00.

"(k) In all cases of appeals to a higher court, a fee not to exceed $50.00 for each one-half day spent in the Circuit Court, plus $100.00 for every 400 pages of transcript, or major fraction thereof, but not less than $100.00; plus $250.00 for all proceedings in the higher court where claim of appeal and brief is filed.

No attorney appointed pursuant to this rule shall incur any expense to the county in preparing the indigent's defense without written permission of the trial judge or of the presiding judge, except for ordinary witness fees.

Upon its adoption, this rule shall be effective for all services rendered subsequent thereto."

Appellant contends that the system provided under Wayne Circuit Court Rule 14.13 is irrational and promotes assembly line justice. We cannot agree with this contention. Distinctions are made in the amount of money a lawyer receives if, for example, he conducts a preliminary examination as opposed to waiving a preliminary examination (Rule 14.13 subd [b]). Additional fees are granted if a case is appealed to a higher court (Rule 14.13 subd [k]). Obviously, lawyers may spend more time on some cases than on others and still receive the same compensation, and certainly in some cases a lawyer will receive far below the minimum bar fees. But, in general, the court rule does provide reasonable

compensation for court appointed attorneys for indigents.

Appellant's contention that he has been deprived of due process and equal protection under the United States Constitution and Michigan Constitution 1963 has been discussed and decided adversely to him by numerous courts in this country.[4]  In *United States* v *Dillon,* 346 F2d 633 (CA 9, 1965), *cert den* 382 US 978; 86 S Ct 550; 15 L Ed 2d 469, the Court rejected an attorney's contention that property was taken in violation of due process of law when he was forced to defend an indigent defendant without compensation.  The Court stated (p 635):

"An applicant for admission to practice law may justly be deemed to be aware of the traditions of the profession which he is joining, and to know that one of these traditions is that a lawyer is an officer of the court obligated to represent indigents for little or no compensation upon court order.  Thus, the lawyer has consented to, and assumed, this obligation and when he is called upon to fulfill it, he cannot contend that it is a 'taking of his services.'"

In *Jackson* v *State,* 413 P2d 488, 490 (Alas, 1966), the Court held that the attorney did not have a constitutional right to compensation for defending an indigent defendant.  The Court stated:

"The requirement of the attorneys' oath and Canon 4 reflect a tradition deeply rooted in the common law—that an attorney is an officer of the court assisting the court in the administration of justice, and that as such he has an obligation when called upon by the court to render his services for indigents in criminal cases without payment of a fee ex-

---

[4] For a complete collection of these cases, see 21 ALR3d 804 *et seq.*  It appears that only one state, Indiana, has held that the state constitution requires compensation for an attorney appointed to represent an indigent defendant.

cept as may be provided by statute or rule of court. This principle is so firmly established in the history of the courts and the legal profession that it may be said to be a condition under which lawyers are licensed to practice as officers of the court."

Likewise, the courts have uniformly rejected the contention that an attorney is denied the equal protection of laws when he defends an indigent without compensation. In *State* v.*Rush,* 46 NJ 399, 407; 217 A2d 441; 21 ALR3d 804 (1966), the Court stated:

"We turn to the constitutional claims advanced by counsel in his own right. They are that an assignment without compensation for services takes private property for public use without just compensation (*N. J. Const., Art* I, *par.* XX; *U. S. Const.,* 5th and 14th Amendments), takes property without due process of law and denies equal protection of the law (*N. J. Const., Art.* I, *par.* I; *U. S. Const.,* 14th Amendment), constitutes involuntary servitude (*U. S. Const.,* 13th Amendment) or peonage prohibited by federal law, 42 *U. S. C. A.* § 1994.

"None of these contentions is new, and if one accepts the premise that the duty to defend the poor is a professional obligation rationally incidental to the right accorded a small segment of the citizenry to practice law, these claims fall away. Essentially the same claims were rejected recently in *United States* v. *Dillon,* 346 *F.* 2*d* 633 (9 *Cir.* 1965), *cert.* denied 86 *S. Ct.* 550 (1966), and *State* v. *Clifton,* 247 *La.* 495, 172 *So.* 2*d* 657, 667 (*Sup. Ct.* 1965). Indeed in *Powell* v. *State of Alabama,* 287 *U. S.* 45, 73, 53 *S. Ct.* 55, 65, 77 *L. Ed* 158, 172 (1932), the Supreme Court assumed without pause that attorneys were so obligated, saying 'Attorneys are officers of the court, and are bound to render service when required by such an appointment,' and although the Supreme Court did not add 'without compensation,' the context makes it clear that uncompensated serv-

ice was in mind. The Supreme Court of course did
not mean that the ultimate obligation to furnish
counsel reposed in the bar rather than in the State,
for quite plainly the obligation the Court there found
and later expanded in *Gideon* v. *Wainwright, supra,*
372 *U. S.* 335, 83 *S. Ct.* 792, 9 *L. Ed* 2*d* 799, is the ob-
ligation of the State itself rather than the personal
obligation of any of its officers, but *Powell* did as-
sume that, if attorneys as officers of the Court were
called to serve without pay, no constitutional re-
straint stood in the way.

"Conceivably the burden upon the bar could reach
such proportions as to give the due process argu-
ment a force it does not now have. We have not
reached that extraordinary stage. Nonetheless, and
far short of that point, there is the policy question
whether in fairness the bar alone should be re-
quired to discharge a duty which constitutionally is
the burden of the State."

The Court in *Rush* also dealt with appellant's
claim that an indigent defendant is denied his con-
stitutional right if lawyers are forced to defend
without compensation. The Court stated (pp 405–
407):

"In strictness counsel for an indigent defendant
is hardly in a position to claim compensation on the
ground that the rights of his assigned client have
been infringed. However, we appreciate that coun-
sel's purpose is to place a pressing problem before
us rather than to gain a dollar result for himself. In
fact, he expressly asks that, should he prevail, the
award for his services be limited to six cents. To
the end that all phases of the issue may be in view,
we will assume he has the status to press the con-
stitutional claims of defendants charged with crime.

"As to the right of an accused, appellant contends
that counsel, if unpaid, cannot by his performance
satisfy the constitutional guarantee of the right to

the aid of counsel. We know of no data to support a claim that an assigned attorney fails or shirks in the least the full measure of an attorney's obligation to a client. Our own experience, both at the bar and on the bench, runs the other way. A lawyer needs no motivation beyond his sense of duty and his pride.

"Nor can it be said that assigned counsel are less qualified than counsel privately retained. As in other callings, some men acquire reputations for excellence. In numbers they are few, and sometimes it is not clear why fortune has chosen them alone. It is understandable that a defendant will seek a lawyer of wide repute if he can afford him, but of course the Constitution does not assure every man, indigent or not, that only a leader of the bar will speak for him. Even the State cannot command such representation; most criminal cases are prosecuted by young men who have yet to be acclaimed but who are not in the least unequal to their responsibility on that account. Nor does preeminence at the bar necessarily bespeak special experience in criminal matters. In the State courts, criminal work is not too rewarding financially. Very few specialize in that area, and overall the well known lawyers have had but sporadic exposure to it.

"Nor is prior experience in criminal matters essential. The law is a vast field and no man is in command of all of it. Lawyers, as do judges, move from scene to scene, absorbing the special features of each. A capacity to that end goes to the essence of the practice of law. A lawyer's training equips him for it, and his every experience sharpens that skill. And although a new scene may demand a greater initial effort, the newcomer may well bring a zeal and a freshness long lost to a tired or comfortable expert.

"Moreover, few cases really turn upon the skill of the advocate. The facts and the applicable law are

quite compelling, and a lawyer who has both on his side will do well against anyone. No doubt a small number of cases are lost through lack of skill or poor preparation, but while the legal profession, like all others, suffers to a degree from the inept and the indolent, the phenomenon cannot be said to be related to a system of assignment of counsel. Further, illogical though it may be, judges tend to have a larger sense of responsibility for the performance of lawyers they assign than for the performance of counsel privately retained, and to the extent that this is true, there may be an advantage for the indigent accused.

"We are satisfied our system of assignment yields representation equal to that obtained by defendants who retain their own counsel. This is not to say that another approach would not be more desirable. Rather our point is that what we have meets the constitutional demand, and to recur to the precise point counsel here seeks to make, we are satisfied that our assignment system does not fall short because assigned counsel are unpaid."

We agree with the New Jersey Court that an indigent defendant is not deprived of his constitutional rights by the appointment of unpaid counsel. Dedication and diligence to a client's cause should not be altered because of the payment of a higher fee. Judging by the numerous complaints received by the State Bar Grievance Administrator, the payment of minimum fees does not insure the quality of work from retained counsel. Most attorneys are dedicated and will zealously protect the rights of any client they defend.

Moreover, the Wayne Circuit Court Rule does provide compensation and, thus, attorneys appointed for indigent defendants are not working without compensation. In this case, defendant Clay was

provided with the services of three attorneys, and it cannot be seriously contended that he was denied his constitutional right of representation by counsel.

Appellant has demonstrated the difficult problems that courts face in insuring an efficient administration of criminal justice, combined with the concern for defendants' constitutional rights. Our Court will continue to work for improvement of our present system, agreeing with appellant that it must be improved.

To this end the State Bar as well as a number of local bar associations have recently petitioned the Court to adopt a rule requiring that court appointed counsel be compensated for their services in accordance with the State Bar Minimum Fee Schedule. Because of these increasingly insistent demands for such a uniform schedule of fees, and in view of the present dialog regarding improved methods of financing the entire judicial system, we shall doubtless review the question again in the future, but for the present we are reluctant to take such action as would plunge the counties into a position of responsibility for the payment of attorneys' fees more than double those presently paid.[5] Such a burden we are not yet prepared to thrust upon them.

Therefore, we hold that Wayne Circuit Court Rule 14.13 is not arbitrary and capricious and does not violate appellant's rights under the due process and equal protection clauses of the United States Constitution or the Michigan Constitution of 1963.

Judgment affirmed.

---

[5] The following statistics were provided by the appropriate governmental units.

Number of indigent defendants appearing in:

| *Recorder's Court—Detroit* | *Circuit Court—Wayne County* |
|---|---|
| 1969:  6,522—Cost $  950,954.11 | 1969:  1,026—Cost $385,439.29 |
| 1970:  8,688—Cost $1,690,648.00 | 1970:  1,451—Cost $531,830.72 |

T. M. Kavanagh, C. J., and T. E. Brennan, T. G.
Kavanagh, and Williams, JJ., concurred with
Swainson, J.

Black, J. (*dissenting*). There are occasions—
few I concede—when the dominant opinion of a mul-
ti-judge court may and should be shorn of credit by
careful rather than casual analysis of the very au-
thorities which the Brethren of greater number cite
as governing. This is such a case.

When the instant application for leave came to
consideration and ultimate grant (September 22,
1970, 384 Mich 752), I informed the other Justices
by memorandum of my view that *State* v *Rush,* 46
NJ 399; 217 A2d 441; 21 ALR3d 804 (1966) was not
for our state persuasively controlling of the consti-
tutional questions decided there. In opposition
thereto the brief *"Slave Labor in the Courts,"* pres-
ently quoted at length,[1] was proffered by the writer
as eminently more convincing evidence that, by our
own experience, this business of little or no compen-
sation for the lawyer forced to do professional work
on behalf of an indigent results in the denial of those
constitutional rights which Judge Hunter considered
so well in his brief.

This appeal by Mr. Meizlish was submitted June
23, 1971. The Court's opinion was delivered to the
writer December 24, 1971.[2] It relies principally on

[1] Case and Comment, July–August issue 1969, Vol 74, No 4, pp 3–
12, by Judge Robert S. Hunter of Illinois.

[2] To the writer the Court's opinion came as a surprise. I expected
the Court to follow at very least New Jersey's lead by affirmatively
declaring a needful judicial policy comporting in some degree with
the concluding paragraph of Division II B of the opinion of the
New Jersey case. The paragraph:

"The burden thus passing to the taxpayers, the members of the
bar, as taxpayers, will of course share in it. But for the time being
at least, we think the members of the bar should contribute something
more, despite still other calls upon them for gratuitous service. To
that end, the compensation should be less than that expected of a

the New Jersey case.  It does not, however, pay or
suggest attention to the judicially important aspects
of the New Jersey case and its result.  It quotes at
considerable length selected parts of Division I A
and I B of Chief Justice Weintraub's opinion, yet
stops cold upon approach to that "policy question"
which the New Jersey Supreme Court considered in
thoughtful detail throughout Divisions II A, II B
and II C of its opinion.

Parenthetically, it is well to note here that the ob-
servations made and conclusions reached in Division
II above resulted in the 1967 enactment of what is
popularly known as New Jersey's public defender
law (NJSA 2A:158A–1).

Coming at once to the policy question:

The New Jersey Supreme Court proceeded on its
own motion.  We should do likewise, the presently
considered request of our State Bar considered.  In
clear specificity we have declared ourselves bound
to that "preclusive responsibility for efficient all-
over-the-State judicial service" which this Court af-
firmed on rehearing of *Wayne Circuit Judges* v
*Wayne County,* 386 Mich 1, 8–10 (1971) (overrul-
ing 383 Mich 10, 33 [1969]), and to that sober af-
firmation that this Court "receives and accepts with
that responsibility the inherent power and duty to
take such action as is reasonably necessary to ful-
fil the constitutional obligation thus undertaken."
Indeed, comparing our constitutional position with
that of New Jersey, it is proper to say again that
"Such power and duty probably transcends that

client who can pay.  The rate should reimburse assigned counsel for
his overhead and yield something toward his own support.  In ap-
proximate terms the overhead of the average law office probably
runs about 40% of gross income.  To meet that expense and yield
something to assigned counsel, we suggest compensation at 60% of
the fee a client of ordinary means would pay an attorney of modest
financial success."

which is imposed correspondingly by any of the other State Constitutions." (Approved on rehearing as above.)

Next for curious examination is the final authority which the Brethren submit as and for support of the conclusions reached at the end of their opinion (*ante* at —— ):

"Finally, as stated in the most recent edition of the *Attorneys' Desk Book—Michigan,* published by the State Bar of Michigan, on page 1:

" 'The lawyer should bear in mind that his profession is an integral factor in the administration of justice. By entering into and becoming a part of the legal profession *he has rejected financial gain as his sole objective—he is not operating a business devoted entirely to showing a net profit—he has voluntarily offered his capabilities and talents to the service of the public.'* (Emphasis added.)"

Reading and rereading the Court's opinion, this quotation just didn't seem to convey any clear or complete thought pertinent to our present inquiry. Curiosity led accordingly to a thorough review of that same "recent edition". There I find light and clarity, headed first by that telltale "However," but not of the kind the Brethren would communicate to the profession. Mercifully, and solely for comprehensive understanding, I think it best that all of us should read aloud and in unison the *entire* paragraph which the Brethren have twained. Here it is (p 1, current edition of the same Desk Book):

"The lawyer should bear in mind that his profession is an integral factor in the administration of justice. By entering into and becoming a part of the legal profession he has rejected financial gain as his sole objective—he is not operating a business devoted entirely to showing a net profit—he has voluntarily offered his capabilities and talents to the

service of the public. However, no lawyer, no matter how dedicated to his profession, should work without proper tools nor for anything less than an adequate standard of living for himself and his family. To these things he is entitled and toward acquiring them he must turn a businesslike countenance." (No emphasis supplied.)

This necessary correction of error is by no means all. In the same Desk Book starting on page 37, there appears the entire topic "Indigent Defendants —Court Appointed Counsel—Fees," the section being 13a. Perhaps, to provide full understanding for such lawyers and judges outside our state as may be interested in our problem, it would be well to copy here the entire context of § 13a as it appears below the title quoted:

"The Committee has reviewed a number of schedules and local Court rules for compensation to appointed counsel for criminal defense.

"It finds none of the schedules or rules satisfactory or acceptable.

"Keeping in mind the recent decisions and various rules adopted pertaining to this field, there are inescapable conclusions:

"1. The historical role of the lawyer, and his duty as an officer of the Court, is changing in this nearly revolutionary era;

"2. Compensation to the lawyer cannot be measured by ancient concepts that no longer apply to our present way of life;

"3. Judges, prosecuting attorneys, court reporters, juries, witnesses, policemen, and everyone else involved with indigent defendants receive the same compensation as they would receive if the defendant was not indigent;

"4. Only lawyers representing the defendant are asked to sacrifice their minimum fees, and accept as

payment a sum considerably below the minimum set forth in this fee schedule;

"5. The constitutional guaranties that provide counsel for indigent defendants are guaranties by the people of the United States, not by the legal profession itself;

"6. If the guaranty is made, provision for its practical application should be made by the same source from which the guaranty came;

"7. The lawyer, as a taxpaying member of the society making such guaranties, has already devoted his fair share to the cause of this constitutional protection.

"Therefore, it is the recommendation of this Committee, that lawyers appointed to represent indigent defendants submit statements, and receive compensation at a sum not less than as provided in this minimum fee schedule."

But hold. There is more, the State Bar considered. May 1, 1971 the Board of Commissioners of the State Bar presented to us, with cogent reasons this Court may and should judicially notice, its courteous request that the Court act affirmatively in the present area. That was done by letter addressed by President Joiner of the State Bar to our Chief Justice.[3] The concluding three paragraphs of that letter provide a clear picture of Michigan's situation as regards necessary compensation of lawyers appointed to act for indigent accused persons.

---

[3] This resolution and request came to consideration during ensuing meetings of the Court and was passed each time. In the meantime the appeal of Mr. Meizlish came to submission and awaited decision. Finally, November 9 last, the resolution and request were tabled unanimously, the writer at least figuring that the Court would determine the request by announcement here of some or any policy decision, as done in the steadily studied New Jersey case.

This is not to be, as the opinion received Christmas Eve now foretells. The State Bar will not have received the courtesy of a response to its message, either by order or letter known thus far to the writer, except by the negation of words appearing in the Court's instant opinion.

They also provide that kind of evidence which should satisfy all of us that Mr. Meizlish is right when he says that his professional time, which after all is a property right, has been stolen from him by the compulsion of a judicial order payable only by a niggardly draft for $50 with the rest, employing Mr. Lincoln's homely expression, "paid off in conversation". The paragraphs:

"Public defender systems and statewide assumption of the costs of the administration of justice are worth while but long-range solutions to the problem. They do not provide any measure of immediate relief which is desperately needed if the administration of criminal justice is not to collapse as a result of the failure of substantial segments of the private Bar to render complete or adequate representation in cases in which they are virtually uncompensated.

"Lawyers do not for a moment contend that they should be entitled to payment of their usual fees in cases in which they are assigned to represent the indigent. We accept the responsibility for some measure of public service involved in such assignments. But a minimum level of compensation, at least assuring that the assigned lawyer will not bear a significant economic loss as a result of an assignment, seems not unreasonable.

"Consequently, the Board of Commissioners of the State Bar at its last meeting voted to urge the Supreme Court of Michigan to adopt a General Court Rule that attorneys assigned to represent indigent defendants in criminal cases in courts throughout the State be compensated at the rate provided for the services rendered in the State Bar Minimum Fee Schedule."[4]

The Court's payoff in worthless words appears in its summary concluding paragraph: "Our Court will

---

[4] For published announcement with detail of the State Bar's action, see the May 1971 issue of MSBJ, p 291 headed "Court Rule Urged on Assigned Counsel Fees."

continue to work for improvement of our present system, and agree with appellant that it must be improved." (*Ante* at 241.) This comes with sorry grace from lawyer-Justices who pay no office rent, are furnished sumptuous offices with all modern furniture and equipment fit for lawyer kings, the finest of top-paid legal secretaries and research clerks, a fully complete and convenient State Law Library, an ever-expanding administrative staff including three Court Commissioners assigned to applications for leave to appeal, $5,000 new cars every two years and no end of fringe benefits, all for free plus top or near top State Supreme Court salaries ($42,000 per Justice annually). It rings devoid either of duty, candor, or respect for the profession of our choice. Too, it suggests some unfamiliarity with the overhead cost of operating a properly functioning law office. As to this last, see *Babcock* v *The Public Bank,* 366 Mich 124 (1962), handed down when we found that such overhead stood at approximately 35% of gross income, and compare it with the more recent estimate, "40% of gross income.", found in the New Jersey case (II B).

*To Conclude:*

1. Today in our state there is no fair or equal treatment of lawyers forced to serve the indigent. Much in that regard depends upon the varying attitudes of assigning trial judges. The Justices either know that or should take time to read the studies and records which the Court Administrator has made and compiled in the past decade. The State Bar and the local associations that have appealed to us are ignored, for no reason I can perceive save those of politics and a desire to offend, as minimally as possible, those local officers and legislators who regard themselves as already offended by our deci-

sion on rehearing of the *Wayne Circuit Judges* v *Wayne County,* 386 Mich 1 (1971). The situation calls for an overdue declaration of our Court much as appears in the beginning paragraph of II B of the New Jersey opinion:

"The next question is whether we should continue to require members of the bar to absorb the full cost of the defense of the indigent. We think we should not."

2. Now for Judge Hunter's brief. It is necessarily lengthy, setting forth as it does with exhaustive detail a list of the states which provide specific amounts of compensation "in capital cases"; another of those providing compensation in prosecutions for "non-capital felonies"; another of those making provision of specific amounts of compensation "when cases go to Courts of Appeal"; another of those providing compensation in specific amounts "without distinguishing between capitals, felonies and misdemeanors"; another of those providing compensation "but not in a specific amount"; another of those providing compensation without benefit of statute and, of course, thorough references to the various authorities, *State* v *Rush* included.

In full substance the brief would occupy too many pages for incorporation in our reports. For that reason the textual quotation appearing below is restricted to that which commences with the topical heading "Unconstitutional System" (Case and Comment, p 7) and continues through the supporting topic headed "Awesome Burden" (ending on page 12). It is submitted as representing fairly my stand for reversal and remand with instruction that the circuit court ascertain and order paid a reasonable fee for the services rendered by attorney Meizlish, and for the drafting and immediate effectiveness of

an appropriate Rule of Court comporting with the aforesaid resolution of the Board of Commissioners of the State Bar.

SUPPLEMENT (February 22, 1972)

By memorandum to the Justices dated February 17, Justice Swainson advises that he is deleting from his opinion the paragraph thereof which I have quoted and criticized (*ante* at 244). The memo concludes:

"It has been my experience on the Bench that lawyers, at least in the metropolitan Detroit area, are not forced to take cases of indigent defendants against their will. In reality many lawyers desire to take these cases and feel that the present compensation rates are adequate."

This factual declaration of experience in the metropolitan Detroit area, that of *not* forcing lawyers "to take cases of indigent defendants against their will", hardly squares with the State Bar's more thorough and (as I deferentially suggest) more detailed and less casual representations to us of May 1, 1971 (quoted *ante* at 247). The fact if true must also account for quite a share of that steadily burgeoning deluge of criminal appeals, emanating from that same metropolitan area, which the Court of Appeals has suffered since it was set up for business in 1965. It means too that outstate judges are correspondingly free to let the will of the lawyer determine whether he should or should not accept an indigency assignment. It means finally that appellant Meizlish, along with others that are correspondingly dissatisfied, are no longer bound to accept such assignments save as they may desire.

SECOND SUPPLEMENT (March 30, 1972)

On the most recent day when our opinions of this appeal were due for release (February 25 last),

Justice SWAINSON amended the majority opinion so as to set forth that complete new paragraph which appears *ante* at 241 and commences "To this end the State Bar  *  *  *  ."

*Comment:* At last the foregoing dissent has accomplished a little—at least. The little is that the State Bar now will have received an answer to its resolved and MSBJ-published plea of May 1, 1971 (discussed and quoted *ante* at 247 by the writer). By that answer there is revealed the real reason for the determination of our majority to affirm. The Court is "reluctant to take such action as would plunge the counties into a position of responsibility for the payment of attorneys' fees more than double those presently paid".

A further comment is in order. The sole factual support, proffered by the majority for its February 25 amendment, consists of judicial statistics provided by the Wayne County Circuit Court and the Recorder's Court of Detroit. No reference to or statistics concerning the rest of the State are submitted by this Detroit-oriented Supreme Court. Nor in the majority opinion is there any word quite so bold as to suggest that the 82 counties outside Wayne would, by grant of the plea of the State Bar, be cast in the same position as that which the Brethren in majority so expansively and gratuitously describe for the trial courts in Wayne County. Would grant of that plea "plunge the [82] counties into a position of responsibility for the payment of attorneys' fees more than double those presently paid"?

## *APPENDIX*

"Slave Labor in the Courts" (July-August 1969 issue of Case and Comment, starting at page 7 and concluding on page 12 with footnotes omitted).

*Unconstitutional System*

There are two basic faults that result when compensation is inadequate or nonexistent. Each renders the system unconstitutional. Each involves entirely different considerations.

In the first place, the appointment of an attorney who serves without compensation and under the threat of jail or fine, or both, deprives an indigent defendant of his right to adequate representation, a right which has been guaranteed to him by both state and federal constitutions.

The procedure is also subject to the constitutional objection that court appointment without compensation deprives the attorney of property without due process. It also deprives him of the equal protection of the law. Both rights are guaranteed to him by the federal and state constitutions.

The attorney, throughout history, has been notoriously incapable of enlisting public sympathy in his own support. Consequently, there is little likelihood that there will be any groundswell of support for lawyers where this issue is presented. The decisions of the United States Supreme Court during the last several decades would indicate that that court would be much more sympathetic to the first of these arguments, namely that, if an indigent criminal is to have adequate representation, he must have something better than slave labor to represent him.

It has been said that the rich and the poor are equal in the eyes of the law; both have the right to sleep under a bridge. A comparable statement would be that the rich and the poor are equal in the eyes of the law since they both have a right to counsel. But the rich are entitled to well-paid counsel who is happy about his employment, while the unpaid counsel appears reluctantly, possibly bitter over the imposition which has been cast upon him.

It is an enormous tribute to the attorneys that, since the earliest days, they have given countless

hours and unlimited energy to the defense of the indigent criminal without compensation. Yet, attorneys are no less human than anyone else. It is only natural that slave labor produced under the threat of punishment would be of a markedly lower quality than labor that is paid for at the rate of $25, $50, even $100 or more, per hour. Consequently, it is a farce and a travesty even to pretend that the court-appointed attorney will represent a defendant with all the enthusiasm, energy and unlimited zeal that a competent attorney will exhibit when adequately compensated.

A remarkably high percentage of pleas of guilty have been entered by court-appointed attorneys serving without compensation. For instance, in one study, it was learned that 75% of the defendants with court-appointed counsel plead guilty, while, during the same period, only 20% of those with retained counsel plead guilty. It is submitted that the percentage would be even more disproportionate in most nonmetropolitan state courts.

It is no secret that virtually every court-appointed attorney will make a diligent effort to obtain a guilty plea. This often takes some rather clever persuasion. Such persuasion, however, is usually effective.

It is essential to note that this duty arose during the early history of our country when social and economic conditions were vastly different from those prevailing today.

The income of the average lawyer was meager. If he lost a fee now and then, it really didn't make very much difference. Today, in order to attract the best minds in the country to one of the most complex of the professions, the income of the average attorney rates only a little below that of doctors, dentists, executives and the other leaders of the nation.

Even more significant is the fact that the attorney of the late Eighteenth and early Nineteenth Cen-

turies, when most states came into the Union, had
virtually no overhead. He did not have to purchase
any complicated office equipment. His library ex-
penses were almost nil. He had no staff to pay.
Rent was low. There was no such thing as tele-
phone, jet transportation, and all the other enormous
expenses that every busy practitioner encounters
today.

An individual practitioner today has overhead
that might range from $10 to $20 or more for each
hour that he is working. If he is called to serve
under a court appointment for an indigent defend-
ant, he might be expected to spend 20 to 100 hours.
This means that he will have to pay out of his own
pocket for the actual work that can be directly at-
tributable to this case a sum anywhere from several
hundred dollars to thousands of dollars.

Experience indicates that about one-half the
lawyer's gross income goes to the payment of over-
head. As a result, a lawyer who nets $20,000 per
year has an average hourly overhead of $10.00 If
he were to accept a felony case that took two weeks
to prepare and try, it would be tantamount to a court
order to pay $800 out of his own pocket, merely to
maintain his office for the purpose of preparing and
trying the case.

His other losses are even more onerous. Today's
lawyer who is making an income adequate for a
decent living has to handle an enormous volume of
work. He has to handle more cases than was re-
quired a hundred to a hundred-fifty years ago.

The representation of a criminal defendant re-
quires the attorney to be out of his office for a con-
siderable period of time. This results in the loss of
income and the burden of all the overhead that runs
on while he is so engaged. It also has an extremely
harsh result in that clients are very fickle and feel
that if a criminal matter is more important than
their civil matters, they will go to another lawyer.

It is safe to say that, in any serious court-appointment case, the attorney will lose one or more clients as a direct result of this representation. Clients are not easily gained or replaced.

There is another manner in which present conditions differ vastly from those which prevailed in the early days of the country. The right to court-appointed counsel at that time was not nearly as extensive as it is today. As a result, counsel was appointed in a much lower percentage of criminal cases than such appointments are made today. Even more dramatic is the increase in the number of crimes and prosecutions.

### Awesome Burden

The incredible increase in criminal cases results in a sharp increase in the burden on court-appointed attorneys. While the number of attorneys has not increased in smaller communities, the number of cases in which they are appointed has increased astronomically.

What was a minor nuisance for the Nineteenth Century lawyer has become an awesome burden for the lawyers in smaller counties during the latter half of the Twentieth Century. Even if the economics had not changed, the volume has increased to staggering proportions for this minority that is forced to bear most of the burden. When that condition is compounded by the increased financial burden on the lawyer, the impact of this slave labor without compensation becomes frightful.

When the majority of states entered the Union, the profession of law was the only profession, business or calling governed by the state. This was done through the courts and not through any particular form of legislation.

At common law, the right of the courts to discipline lawyers was traditional. We inherited this form of governmental regulation. At that time, the other professions, businesses and callings were not

regulated by the government. It was reasonable in the Nineteenth Century to impose a condition of practice, such as this duty of the attorney to accept court appointment.

However, since the admission of our states to the Union, countless businesses, professions and callings have been subjected to licensing and control by the federal and state governments, including physicians, surgeons, dentists, osteopaths, chiropractors, beauty operators, barbers, plumbers, medical technicians, nurses, well drillers, warehousemen, and so on, ad infinitum.

The attorney is being deprived of equal protection when he is compelled to perform free services when no other business, profession or calling is required to give its goods or services without compensation.

No court would consider ordering a grocer to give a shelf full of groceries to a poor person just because the state had given him the right to operate his business. Similarly, it is inconceivable that a doctor would be ordered by a court to give his services to the indigent. The plain fact is that it is not necessary for anyone other than lawyers to give their goods or services just because the court so orders.

It is especially ironic, in a land that cherishes its freedom and constitutional rights, that the very person who is charged with the protection and perpetuation of those rights is most flagrantly deprived of his own rights. It is all the more ironic when one considers the extreme informality with which the procedure operates. Normally, a brief telephone call from the judge informs the lawyer of his duty to give of his time, his talents, his energy, even his substance without compensation.

Where are all the trappings of due process and fair play with which our courts demand that the rights and property of all *other* citizens be sur-

rounded? Not only are they entirely lacking, but the whole travesty takes place in a cavalier, expeditious manner that would scarcely be tolerated under a much less enlightened government.

There is a virtually endless list of resources, both governmental and private which meet all the other needs of the indigent person, in a reasonably adequate manner. Government, at all levels, has provisions for medical and allied services. On the other hand, government and private resources have utterly failed and refused to accept the responsibility of paying for the protection of the most important rights: life, liberty and the pursuit of happiness.

With the exception of the limited public defender system, a few legal aid bureaus, and a very fragmentary legal program under the Office of Economic Opportunity, this right of the individual to the adequate protection of his legal rights is virtually ignored in many states.

There are other ways in which this burden upon certain lawyers deprives them of the equal protection of the law.

In the first place there is a vast difference between the burden as it is imposed upon an attorney in a large metropolitan area and in a small county having under 25,000 population.

In Chicago, for instance, most criminals are defended by compensated attorneys from the Public Defender's office. The remainder of the indigent cases are largely represented by court-appointed attorneys who have volunteered their services to obtain this important experience. It can be said that in Cook County there is virtually no imposition upon court-appointed attorneys. On the contrary, they are compensated either through money or experience for the younger attorneys. On the other hand, the small town lawyer is constantly accepting court appointments. Any value received from the experience has long since been reduced virtually to nil.

Another disparity exists in the protection afforded by this governmental system. That is the difference between the impact upon different types of lawyers. Certain types of lawyers are never called upon for this type of representation. They are engaged in certain specialties such as patent, copyright, corporate, probate and similar work. The larger the county, the more specialization exists. On the other hand, in the smaller counties there is no such specialization. The attorney in the smaller county cannot obtain an exemption from this duty by specializing. Again, the burden is shifted onto the general practitioner in the small county, far out of proportion to the similar burden upon the attorney in the metropolitan area.

There is yet another way in which the burden of accepting court appointments is very unfairly distributed. The practice actually works out so that older, more experienced attorneys are rarely called upon to accept court appointment, excepting in most unusual cases where it is incumbent upon the court to see that the defendant has highly competent representation. As a result, in routine criminal cases the great majority of the court appointments are imposed upon attorneys under 45. Within limits, this appointment is welcomed by the young attorney to afford him experience. However, experience is his only compensation. In fact, he often incurs the wrath of the small community, because he has the courage to fight an unpopular cause. This results in the further loss of business not suffered by the attorney in the metropolitan area, or by the older, more successful attorney who is not called upon to represent the indigent defendant.

These discriminations are all the result of the way the system works in practice and not as a result of any particular design.

As a result of these inequities between the different groups of attorneys, it seems likely that the chance that a particular lawyer will be appointed on

any particular date to represent an indigent defendant is a thousand times as great for a young attorney in a rural area as it is for an older, successful attorney in the metropolitan area. This ratio probably reaches closer to infinity, because it is inconceivable that a wealthy, prominent Chicago attorney, who has never tried a case in court would ever be appointed to represent an indigent defendant. A young, struggling lawyer in a county seat having 5,000 population, on the other hand, can probably count with certainty on being appointed sometime within the next ninety days.

The condition is an alarming one for the judges in the rural areas. As a former Circuit Judge, I found it extremely distasteful to go into a county to hold court and, almost without exception, have to look around the county to find an attorney who could represent an indigent defendant. If a local bar consists of five or six lawyers, one of them is the State's Attorney. Another one or two probably are too old to act, so that two or three lawyers end up receiving all of the court appointments. In the rural counties, it is almost a phenomenon to have a defendant charged with a crime who is capable of paying an adequate fee.

ADAMS, J. (*dissenting*). I agree with Justice BLACK that this case should be remanded to the circuit court with instruction that it ascertain and order paid a reasonable fee for the services rendered by Attorney Meizlish. Neither the compensation provided for by Wayne Circuit Court Rule 14.13 or by the State Bar Minimum Fee Schedule is a satisfactory solution to the problem here posed. Until there is a statewide, adequate system for providing counsel for indigent defendants, responsibility for setting counsel's fees should be left with the judge who hears the case and is in a position to determine and set an adequate fee for the services performed.