STATE ex rel. Stephen C.
SCOTT, Relator,

v.

Ellen S. ROPER, Judge, Division 3,
Circuit Court of Boone County,
Respondent.

No. 65918.

Supreme Court of Missouri,
En Banc.

April 2, 1985.

As Corrected April 30, 1985.

Stephen C. Scott, Columbia, for relator.

John Ashcroft, Atty. Gen., Debra Neff, Jefferson City, for respondent.

Tom B. Brown, Edina, for amicus curiae Missouri Bar.

WELLIVER, Judge.

Relator Stephen C. Scott seeks to prohibit Respondent Judge Ellen S. Roper from appointing him to represent an indigent prison inmate in an action to recover damages for an alleged medical malpractice. Relator challenges the constitutionality of § 514.040, RSMo 1978, purporting to authorize such an appointment and claims that compelled representation violates his rights under the federal and state constitutions. This Court has jurisdiction. Mo. Const. art. V, § 4. Our preliminary order must be made permanent.

The underlying suit, Jack L. Wright v. University of Missouri Medical Center and Doctor "John Doe", Boone County Circuit Court Case No. 29AUG 83–411620, was filed *pro se* on August 25, 1983. The pleading was styled "Civil Tort Complaint for Medical Malpractice/Negligence." Attached to the pleading was a Motion to Proceed in Forma Pauperis, a Pauper's Affidavit, and a Motion for Appointment of Counsel. The essence of the complaint as set forth in the pleading is that permanent stitches were left in plaintiff's body after surgery by the physician and the hospital. Plaintiff claims $300,000 actual damages and $300,000 punitive damages.

On August 29, 1983, the Honorable Ellen S. Roper, Judge, entered the following order: "Motion to Proceed in forma pauperis is sustained. Petition is ordered filed. Summons is ordered issued. Mid-Missouri Legal Services appointed to represent plaintiff." Mid-Missouri Legal Services filed a motion and affidavit for withdrawing as appointed counsel, alleging that their charter prohibited them from accepting fee-generating cases. Respondent permitted their withdrawal and appointed relator to represent plaintiff.

Relator filed a "Motion to Quash Appointment of Counsel for Plaintiff and to Permit Counsel to Withdraw; Alternative Motion For Payment of expenses; and, Request to Hold Adverse Ruling in Abeyance to Permit Filing of Petition For Writ of Prohibition." On March 23, 1984, respondent conducted a hearing on these motions. At the hearing, relator testified that the statute under which the court was purportedly exercising its authority was unconstitutional. He further argued that plaintiff's case would require at least $2,500 in expenses in order to proceed. Plaintiff testified that he contacted one attorney in St. Louis, one in Kansas City, and one in Springfield but they would not take his case. He did not remember their names.

Relator argues, *inter alia*, that requiring him to represent the plaintiff in the underlying action is an unconstitutional taking of his property without just compensation. He also avers that he cannot be compelled to advance litigation expenses because that would also amount to a taking of property without just compensation. He claims that such compelled representation is a violation of due process and amounts to an involuntary servitude.[1] Relator suggests that he was apparently appointed pursuant to § 514.040, RSMo 1978 inasmuch as no other authority for such appointment has been located. The Attorney General, on the other hand, arguing in behalf of respondent, contends that this duty imposed on the individual attorney is a "professional obligation to represent an indigent plaintiff as part of his duties as an officer of the court," and "[a]n applicant for admission to practice law may justly be deemed to be aware of the traditions of the profession which he is joining."

# I

■ Although it is not clear that respondent relied solely upon § 514.040, RSMo 1978 to justify her appointment of relator, we initially address relator's argument that the statute is unconstitutional. The statute provides:

If any court shall, before or after the commencement of any suit pending before it, be satisfied that the plaintiff is a poor person, and unable to prosecute his or her suit, and pay the costs and expenses thereof, such court may, in its discretion, permit him or her to commence and prosecute his or her action as a poor person, and thereupon such poor

---

1. In view of our disposition of this case, we need not pass on relator's argument that uncompensated compelled appointments are an involuntary servitude in violation of the Thirteenth Amendment to the federal constitution. We observe, however, that such arguments have uniformly been rejected as without any merit. *E.g., Family Division Trial Lawyers v. Moultrie,* 725 F.2d 695, 704–05 (D.C.Cir.1984); *Bradshaw v. United States District Court for S.D. of California,* 742 F.2d 515, 517, n. 2 (9th Cir.1984); *Williamson v. Vardeman,* 674 F.2d 1211, 1214–15 (8th Cir.1982); *White v. United States Pipe & Foundry Co.,* 646 F.2d 203, 205, n. 3 (5th Cir. 1981).

person shall have all necessary process and proceedings as in other cases, without fees, tax or charge; and the court may assign to such person counsel, who, as well as all other officers of the court, shall perform their duties in such suit without fee or reward; but if judgment is entered for the plaintiff, costs shall be recovered, which shall be collected for the use of the officers of the court. This statute was first enacted in 1821, and it was passed against the background of already existing poor laws. 1 Mo.Terr. & State Laws Ch. 363, at 843 (1821). For example, the court of common pleas was already empowered to spend county funds for the maintenance of the poor. 1 Mo. Terr. & State Laws Ch. 121, at 340 (1815). Counties were saddled with the responsibility of supporting and maintaining their poor. When the legislature passed these laws, they intended to relieve a particular class of persons. For one hundred and seventy years the legislature has retained the classification for persons deemed poor: "[A]ged, infirm, lame, blind or sick persons, who are unable to support themselves, and when there are no other persons required by law and able to maintain them, shall be deemed poor persons." § 205.590, RSMo 1978. We do not believe that the plaintiff in the underlying suit can bring himself within the definition of the term as used by the legislature when § 514.040 was enacted [2] or that the statute authorizes the appointment in this case.

## II

■ The more important consideration is whether respondent has the inherent power to compel relator to serve as a plaintiff's counsel in a civil malpractice action without compensation and without provision for litigation expenses. We treat first relator's contention that he cannot be compelled to spend his own funds for litigation, such as for obtaining depositions and securing expert testimony. *See Williamson v. Vardeman, supra,* at 1215; *People v. Randolph,* 35 Ill.2d 24, 219 N.E.2d 337, 340 (1966); *State v. Robinson,* 123 N.H. 665, 465 A.2d 1214, 1217 (1983). In *State ex rel. Wolff v. Ruddy,* 617 S.W.2d 64 (Mo. banc 1981), *cert. denied,* 454 U.S. 1142, 102 S.Ct. 1000, 71 L.Ed.2d 293 (1982), this Court, faced with a situation "approaching crisis proportion," held that "[w]e know of no requirement of either law or professional ethics which requires attorneys to advance personal funds in substantial amounts for the payment of either costs or expenses of the preparation of a proper defense of the indigent accused." *Wolff v. Ruddy, supra,* at 67. To abandon this rule in a civil suit where the requirement of counsel is less compelling would be illogical and manifestly unjust, and we decline to so hold. While compelled representation without a source for litigation expenses might work a perversion of justice, we nevertheless must address whether the court can compel such representation independent of the issue concerning litigation expenses.

## III

The precise question of whether the court has the inherent power to appoint and compel counsel to serve without compensation in civil cases has not been resolved in this State. While there is a long history of appointment of counsel in criminal cases, no such similar history exists for civil cases. Appointments in criminal cases can be traced to statehood. Our first con-

---

**2.** Our Supreme Court Rule 77.04 paralleled the language of § 514.040 until 1981, when the pertinent part of that rule was omitted in the present rule 77.03. Our rules do not contain a similar definitional provision.

It might also be noted that § 514.040 would require that *all* "officers of the court" serve without fee. During the colonial period, the judge, bailiff, clerk and sheriff were "paid chiefly, if not exclusively, by fees collected for their services." Silverstein, "Waiver of Court Costs and Appointment of Counsel for Poor Persons in Civil Cases," 2 Val.U.L.Rev. 21, 27 (1967). *See also* Maguire, "Poverty and Civil Litigation," 36 Harv.L.Rev. 361 (1923). While we need not decide the question, the statute would appear to require that *all* these "officers" not receive compensation for their services. However, in today's practice these "officers" would undoubtedly receive compensation because they are no longer paid by fees from the parties but rather they receive an annual salary.

stitution authorized the appointment of counsel in certain criminal trials involving slaves. Mo. Const. art. 3 § 27 (1820). Although this court long ago rejected the idea of gratuitous service as "too fanciful and romantic," *Kelley v. Andrew County,* 43 Mo. 338, 342 (1869), in dicta in a later case it was noted that an attorney representing an indigent criminal defendant does so without compensation as an "officer of the court." *State ex rel. Gentry v. Becker,* 351 Mo. 769, 174 S.W.2d 181, 184 (1943). During this time and until a later opinion by this Court, Missouri attorneys *willingly* accepted such appointments in the face of a growing hardship imposed on the Bar. *See* Bradley, "Court Appointed Counsel for Indigent in Missouri: Reasonable Compensation and Expenses Should be Allowed," 21 J.Mo. Bar 101 (1965); Light, "Compensation and Expenses for Appointed Counsel in Criminal Cases," 4 J. Mo. Bar 97 (1948); Richardson, Reardon & Simeone, "Legal Aid to Indigents in Criminal and Quasi-Criminal Proceedings," 19 J.Mo. Bar 525 (1963). As one of the last states to decide the question, we held in 1971 that attorneys would no longer be compelled to render gratuitous service. *State v. Green,* 470 S.W.2d 571 (Mo. banc 1971). *Cf. Wolff v. Ruddy, supra.*

A similar paucity of case law concerning appointments in civil cases exists in other jurisdictions.[3] The vast majority of courts considering appointments without compensation do so in the context of a criminal case, and even these decisions contain a diversity of views. Of those courts addressing the issue of uncompensated criminal appointments it would appear that a majority would not require compensation. The "claimed majority," however, "is not nearly so solid or monolithic" as one might expect. Shapiro, "The Enigma of the Lawyer's Duty to Serve," 55 N.Y.U.L.Rev. 735, 755 (1980). A strong minority of courts adhere to the position that such compelled representation is unjustified and unconstitutional. We believe that it is essential to examine these various decisions, their efficacy, and their application to civil cases such as the one at bar.

The issue of compelled representation in criminal cases first arose in the context of a suit by the lawyer against a county government to collect a fee having been awarded to him by the trial court. With the exception of Iowa, Indiana and Wisconsin, the majority of courts held that an attorney could not maintain an action against the county unless there was an express statutory authorization for funds.[4]

**3.** *Cf. In re Smiley,* 36 N.Y.2d 433, 369 N.Y.S.2d 87, 330 N.E.2d 53 (1975) (indigent in divorce action claimed constitutional right to appointed counsel or have compensation provided for retained counsel); *House v. Whitis,* 64 Tenn. 690, 692 (1875) (dicta in unrelated area that appointed counsel in either criminal or civil cases). The issue recently arose in *Ex parte Dibble,* 279 S.C. 592, 310 S.E.2d 440 (1983), where that court without much discussion held that lawyers were public officers, bound by their profession's "legally enforceable" Ethical Consideration Rules, and members of a "profession" rather than an "occupation." *Id.* 310 S.E.2d at 442–43. A California appellate court also has imposed the obligation in civil cases where an indigent prisoner is being sued. *Yarbrough v. Superior Court of Napa County,* 150 Cal.App.3d 388, 197 Cal.Rptr. 737 (1 Dist.1983). *See also Payne v. Superior Court,* 17 Cal.3d 908, 132 Cal.Rptr. 405, 553 P.2d 565 (1976). One of the judges in that case felt bound by *stare decisis* and called on the State Supreme Court to reconsider the law in this area. The case has received much attention and is currently on appeal. *See generally* Galante,

"California Bar Draws Line on Pro Bono; Work in Indigents' Civil Cases Hit," *National Law Journal,* October 8, 1984, at 3; Kaplan, "No Pay for Civil Appointments," *National Law Journal,* January 23, 1984, at 2; Victor, "Pro Bono Work Attracting Some Firms; More Needed," *National Law Journal,* March 4, 1985, at 1.

In federal courts, pursuant to 28 U.S.C. 1915(d) courts may only "request" that an attorney serve in civil cases. *McKeever v. Israel,* 689 F.2d 1315, 1319 (7th Cir.1982); *Allison v. Wilson,* 277 F.Supp. 271 (N.D.Calif.1967); *Wagner v. Maroney,* 263 F.Supp. 377 (W.D.Pa.1967).

**4.** *See e.g., Posey & Tompkins v. Mobile County,* 50 Ala. 6 (1873); *Arkansas County v. Freeman & Johnson,* 31 Ark. 266 (1876); *Elam v. Johnson,* 48 Ga. 348 (1873); *Vise v. The County of Hamilton,* 19 Ill. 78 (1857); *Case v. Shawnee Co.,* 4 Kan. 511 (1868); *State v. Simmons,* 43 La.Ann. 991, 10 So. 382 (1891) (parish not liable); *Bacon v. The County of Wayne,* 1 Mich. 461 (1850); *Dismukes v. Board of Supervisors,* 58 Miss. 612 (1881); *Kelley v. Andrew County, supra; People v. The Supervisors of Albany,* 28 How.Pr. 22

The courts in these early cases were less concerned with the plight of the attorney than with the liability of a governmental body.[5] A number of these courts, however, noted that lawyers are officers of the court and thus render their services gratuitously. In *Vise v. The County of Hamilton*, for example, the court observed that lawyers are officials of the court and "[t]he law confers on licensed attorneys rights and privileges, and with them imposes duties and obligations, which must be reciprocally enjoyed and performed." *Vise v. The County of Hamilton, supra,* at 79. Generally, when holding that a county was not liable for an attorneys' services absent legislative authorization, courts often bolstered their argument by suggesting that gratuitous service was an obligation incident to certain privileges accorded an attorney as an officer of the court.

The doctrine that lawyers are officers of the court and accorded certain privileges is generally attributed to the common law of England. Few courts, however, discussed the doctrine's application in this country. The matter was mentioned in *Leigh's Case*, 15 Va. (1 Munf.) 468 (1810), where Judge Roane Commented:

> It is not necessary, in this case, to consider whether, and in what degree attorneys are considered in this country (as they are in *England*) officers *of their respective courts;* though it is easy to see that an attorney, in this country, not having as many *privileges* as the English attorneys, in consideration of which, that character is there holden to attach, a difference may probably exist in this country.

*Id.* at 479. An early Pennsylvania case also illustrates that—while retaining some privileges—attorneys during the colonial period did not claim many of the exalted privileges such as "an exemption from arrest, or militia duty." *Respublica v. Fisher & Mifflin,* Pa. (1 Yeates) 350, 351 (1794). The absence of any such special privileges in Indiana, led the high court of that state to hold that no reciprocal obligation could be imposed on the attorney to render gratuitous service:

> The gratuitous defence of a pauper is placed upon two grounds, viz., as an honorary duty, even as far back as the civil law; and as a statutory requirement. Honorary duties are hardly susceptible of enforcement in a Court of law. Besides, in this state, the profession of the law was never much favored by special pecuniary emoluments, save, some years ago, in the case of docket-fees in certain contingencies. The reciprocal obligations of the profession to the body politic, are slender in proportion. Under our present constitution, it is reduced to where it always should have been, a common level with all other professions and pursuits. Its practitioners have no specific fees taxed by law—no special privileges or odious discriminations in their favor. Every voter who can find business, may practice on such terms as he contracts for. The practitioner, therefore, owes no honorary services to any other citizen, or the public.... The idea of one calling enjoying peculiar privileges, and therefore being more honorable than any other, is not congenial to our institutions. And that any class should be paid for their particular services in empty honors, is an obsolete idea, belonging to another age and to a state of society hostile to liberty and equal rights.
>
> The legal profession having been thus properly stripped of all its odious distinctions and peculiar emoluments, the public can no longer demand of that class of

---

(1864); *Wayne County v. Waller,* 90 Pa. 99 (1879); *Presby v. Klickitat County,* 5 Wash. 329, 31 P. 876 (1892). *See generally* Annot., 21 A.L. R.3d 819 (1968).

**5.** A frequent issue in the nineteenth century was the liability of a county for various services rendered to the poor. *See e.g., Cantrell v. Clark County,* 47 Ark. 239, 1 S.W. 200 (1886); *City of*

*Alton v. Madison County,* 21 Ill. (11 Peck) 115 (1859); *Mansfield v. Sac County,* 60 Iowa 11, 14 N.W. 73 (1882); *Inhabitants of Dalton v. Inhabitants of Hinsdale,* 6 Mass. 501 (1810); *Handlin v. Morgan County,* 57 Mo. 114 (1874); *Otis v. Town of Strafford,* 10 N.H. 352 (1839); *Gourley v. Allen,* 5 Cow. 644 (N.Y.1825).

citizens any gratuitous services which would not be demandable of every other class. To the attorney, his profession is his means of livelihood. His legal knowledge is his capital stock. His professional services are no more at the mercy of the public, as to remuneration, than are the goods of the merchant, or the crops of the farmer, or the wares of the mechanic.

*Webb v. Baird,* 6 Ind. 13, 16–17 (1854). The officer of the court doctrine also arose in other contexts.[6]

The seminal case in the twentieth century, decided in the wake of the United States Supreme Court decisions requiring the appointment of counsel for indigent defendants, is *United States v. Dillon,* 346 F.2d 633 (9th Cir.1965), *cert. denied,* 382 U.S. 978, 86 S.Ct. 550, 15 L.Ed.2d 469 (1966). Relying heavily upon the brief of the appellant in that case, the Ninth Circuit held that the obligation to serve indigents on court order without compensation is "an ancient and established tradition" and "a condition under which lawyers are licensed to practice as officers of the court ..." *United States v. Dillon, supra,* at 635. The court rejected the argument that compelled service amounts to a taking of property without just compensation:

An applicant for admission to practice law may justly be deemed to be aware of the traditions of the profession which he is joining, and to know that one of these traditions is that a lawyer is an officer of the court obligated to represent indigents for little or no compensation upon court order. Thus, the lawyer has consented to, and assumed, this obligation and when he is called upon to fulfill it, he cannot contend that it is a "taking of his services."

*Id.* In an appendix to the opinion, the court reprinted appellant's brief detailing the historical foundation for its holding. The party in the brief argued that "[r]epresentation of indigents upon court order is an ancient tradition of the legal profession, going as far back as fifteenth-century England and pre-Revolutionary America." *Id.* at 636. The brief concluded with language that parallels the holding of the court. The impact of the *Dillon* decision is clear, as subsequent opinions most often cite or quote language from the decision without discussion.[7]

However, a number of these jurisdictions are beginning to question the ever increasing burden on the members of the bar. Their opinions expressly or impliedly suggest that at some time this growing burden

**6.** The question occasionally arose in the context of whether lawyers held an "office" under the state constitution. *See In re Baum,* 55 Hun. 611, 8 N.Y.Supp. 771 (1890); *Case of Austin,* 5 Rawle 191, 203 (Pa.1835). *See also Byrne v. Stewart,* 3 S.C.Eq. (3 Des.) 466, 471, 477 (1812) (while a number of statutes apparently regulated attorneys as if they were public officials, the court held that attorneys do not hold public office). Such questions most likely dissipated in the wake of the deregulation of the legal profession in the mid-nineteenth century. *See generally* J.W. Hurst, *The Growth of American Law: The Law Makers* 249–52 (1950); R. Pound, *The Lawyer From Antiquity to Modern Times* 221–42 (1953); C. Warren, *A History of the American Bar* 212–24 (1911). The United States Supreme Court has also discussed the phrase "officer of the court." *Ferri v. Ackerman,* 444 U.S. 193, 202, 100 S.Ct. 402, 408, 62 L.Ed.2d 355 (1979); *In re Griffiths,* 413 U.S. 717, 728–29, 93 S.Ct. 2851, 2858–59, 37 L.Ed.2d 910 (1973); *Cammer v. United States,* 350 U.S. 399, 405, 76 S.Ct. 456, 459, 100 L.Ed. 474 (1956); *Powell v. Alabama,* 287 U.S. 45, 73, 53 S.Ct. 55, 65, 77 L.Ed. 158

(1932); *Ex parte Garland,* 71 U.S. (4 Wall.) 333, 378–79, 18 L.Ed. 366 (1866).

**7.** *See e.g., White v. United States Pipe & Foundry Co.,* 646 F.2d 203 (5th Cir.1981); *Tyler v. Lark,* 472 F.2d 1077, 1079 (8th Cir.1973); *Dolan v. United States,* 351 F.2d 671 (5th Cir.1965); *Jackson v. State,* 413 P.2d 488, 490 (Alaska 1966); *Johnson v. Board of Supervisors of County of Pima,* 4 Ariz.App. 33, 417 P.2d 546 (1966); *State v. Ruiz,* 269 Ark. 331, 602 S.W.2d 625, 627 (1980); *Lindh v. O'Hara,* 325 A.2d 84, 92, 94 (Del.1974); *Marion County v. DeBoisblanc,* 410 So.2d 951, 953, n. 1 (Fla.Dist.Ct.App.1982); *People v. Randolph, supra,* 219 N.E.2d at 340; *In re Meizlish,* 387 Mich. 228, 196 N.W.2d 129, 132–33 (1972); *Young v. State,* 255 So.2d 318, 321 (Miss.1971); *State ex rel. Stephens v. District Court of 13th J.D.,* 170 Mont. 22, 550 P.2d 385, 388–89 (1976); *State v. Corey,* 117 N.J.Super. 296, 284 A.2d 395, 399 (1971); *State v. Rush,* 46 N.J. 399, 217 A.2d 441, 445 (1966); *Sontag v. State,* 629 P.2d 1269, 1270–71 (Okla.Crim.Ct. 1981).

may constitute a taking of property. *E.g., Warner v. Commonwealth,* 400 S.W.2d 209, 211 (Ky.1966); *Abodeely v. County of Worcester,* 352 Mass. 719, 227 N.E.2d 486 (1967); *State ex rel. Partain v. Oakley,* 159 W.Va. 805, 227 S.E.2d 314 (1976). After noting that *Dillon* had illustrated that lawyers have traditionally been considered "officers of the court," one court held that it was proper to ask whether the traditional concept had become unfair and unjust and "whether the burden has become such that society should no longer expect the Bar to carry it alone." *Warner v. Commonwealth, supra,* at 211. The court found the argument convincing, but chose to await legislative creation of a proposed state funded defender system rather than change the traditional rule at that time. *Id.* Other courts have held that the time has arrived, and as a matter of policy relieved the bar of its burden. *See e.g., Jackson v. State, supra,* at 490; *Smith v. State,* 118 N.H. 764, 394 A.2d 834 (1978). For example, in *State v. Rush,* the New Jersey court observed that "there is no doubt that it was the professional obligation of the English and the American attorney to accept an assignment to represent an indigent defendant," but held that attorneys should not bear this burden alone and ordered compensation in future cases. *State v. Rush, supra,* 217 A.2d at 443, 449. It might be noted that by the mid-twentieth century most state legislatures had already provided for some compensation. *State v. Horton,* 34 N.J. 518, 170 A.2d 1, 6 (1961).

In addition to the so-called historic role of attorneys as officers of the court, some decisions appear to rest upon a vague notion that lawyers have a *professional obligation* to provide gratuitous service upon court order. *See e.g., State v. Ruiz, supra,* 602 S.W.2d at 627 (dicta); *State v. Keener,* 224 Kan. 100, 577 P.2d 1182, 1184–85 (1978) (dicta); *Penrod v. Cupp,* 284 Or. 417, 587 P.2d 96, 97 (1978). *See also State ex rel. Acocella v. Allen,* 288 Or. 175, 604 P.2d 391, 394, n. 6 (1979). One court suggests that "[t]he high purpose and traditions of the legal profession require that this burden be shouldered by its members." *State*

*v. Clifton,* 247 La. 495, 172 So.2d 657, 667 (1965). Another fears the loss of professionalism. *Bradshaw v. United States District Court, supra,* at 518. Yet another suggests that "[t]he profession of law rests upon its commitment to public service and has long been recognized as a profession that requires its membership to engage in pro bono activities." *In re Snyder,* 734 F.2d 334, 338–39 (8th Cir.1984). The Code of Professional Responsibility and the accompanying ethical considerations are often invoked as a source for this professional obligation. *E.g., In re Smiley, supra,* 369 N.Y.S.2d at 90, 94, 105, 330 N.E.2d at 55, 58, 66 (Fuchsberger, J., dissenting); *Ex parte Dibble, supra,* 310 S.E.2d at 443; *Bradshaw v. United States District Court, supra,* 518.

Unfortunately, the analysis supporting such arguments is "fuzzy and unconvincing." Christensen, "The Lawyer's Pro Bono Publico Responsibility," 1981 A.B. A.R. J. 1, 5 (1981). These arguments are flawed from the outset, as they overlook the debate among members of the American Bar Association over whether the Model Code of Professional Responsibility should be altered to require mandatory pro bono service. *See generally* Christensen, *supra;* Swygert, "Should Indigent Civil Litigants in the Federal Courts have a Right to Appointed Counsel?", 39 Wash. & Lee L.Rev. 1267, 1297 (1982). The participants in this debate acknowledged that no such requirement previously existed in the Code:

Prior to 1969, the Code of Professional Responsibility made no reference to the issues which we are talking about this morning. In the early days of our profession, the code under which we as lawyers operated did not have a provision as to what were our personal or professional responsibilities for *pro bono* representation. The current code and its ethical considerations under which we are operating does speak to that issue. Characterizing the current code, it is at best an aspirational statement dealing with the issue as to whether or not we have a professional responsibility.

*Proceedings Of The Second National Conference On Legal Services & The Public,* December 7 & 8, 1979, at 21 (1981) (statements of Dan Bradley, then President of Legal Services Corporation). A proposed mandatory provision was rejected, and the current Model Code only expresses a policy favoring pro bono representation. *See* Rule 6.1.

■ A substantial minority of courts take the position that an attorney may not be appointed to render gratuitous service. *See Weiner v. Fulton County,* 113 Ga.App. 343, 148 S.E.2d 143, 147 (1966); *Knox County Council v. State ex rel. McCormick,* 217 Ind. 493, 29 N.E.2d 405 (1940); *McNabb v. Osmundson,* 315 N.W.2d 9, 16 (Iowa 1982); *Bedford v. Salt Lake County,* 22 Utah 2d 12, 447 P.2d 193 (1968); *Honore v. Washington State Board of Prison Terms & Paroles,* 77 Wash.2d 660, 466 P.2d 485 (1970); *Carpenter v. County of Dane,* 9 Wis. 274 (1859). For example, "[s]ince 1850 Iowa has stood among that strong minority of states (16 out of 34 jurisdictions that have addressed the issue) holding lawyers compelled to represent indigents must receive reasonable compensation." *McNabb v. Osmundson, supra,* at 16. These courts reason that a lawyer's services are as much his property as a grocer's stock, an electrician's tools, or an individual's home. The mere power of the state to license certain occupations does not justify a taking of property:

> In these modern times practitioners of the professions and of many arts, sciences, trades, and businesses are required to be licensed. The Legislature may in the future require the licensing of restaurant operators and grocers as a

sanitary police measure. If a law should be enacted requiring every person licensed by the state to render services, or furnish the materials of their business, to paupers gratuitously, much difficulty would be found in justifying a decision holding the law unconstitutional as depriving the green grocer or the restaurant operator of his goods, or as depriving the physician, or the barber, or the plumber, or the electrician, or the mechanical engineer of his services, without compensation, while adhering to a rule that licensed attorneys' services may be taken without compensation.

*Knox County Council v. State, supra,* 29 N.E.2d at 412.

The majority of commentators also appear to reject the reasoning in *United States v. Dillon, supra.*[8] A number of these authors take the position that a lawyer's services should be treated as a property right. *See e.g.,* Shapiro, *supra,* at 774; Note, *supra,* at 384–86. Two commentators, for example, aver that "[t]he privilege to practice law is a valuable property right. The right to engage in this vocation, or others, need not be predicated upon the relinquishment of constitutional rights." Gilbert & Gorenfeld, *supra,* at 85. Some of these authors suggest that, if such an obligation can be said to exist, the duty to render gratuitous service can only be premised on the reasoning that lawyers have a monopoly to practice before the courts. It is argued that "the practice of law is a monopoly because it is limited to a select few and because that limitation results in restraints upon the public's use of legal services." Christensen, *supra,* at 15. *See*

---

8. *See generally* Bradley, *supra;* Cheatham, "Availability of Legal Services: The Responsibility of the Individual Lawyer and of the Organized Bar," 12 U.C.L.A. L.Rev. 438 (1965); Christensen, *supra;* Ervin, "Uncompensated Counsel: They Do Not Meet the Constitutional Mandate," 49 A.B.A.J. 435 (1963); Gilbert & Gorenfeld, "The Constitution Should Protect Everyone— Even Lawyers," 12 Pepperdine L.Rev. 75 (1984); Lamkin, "Compensation of Appointed Counsel in Criminal Cases," 19 J.Mo.Bar 412 (1962); Light, *supra;* Marks, "A Lawyer's Duty to Take All Comers and Many Who Do Not Come," 30

U.Miami L.Rev. 915 (1976); Martineau, "The Attorney As An Officer of the Court: Time to Take the Gown Off the Bar," 35 S.C.L.Rev. 541 (1984); Podgers, "Mandatory Pro Bono: Basic Question Remains," 66 A.B.A.J. 280 (1980); Rauch, "Public Interest Law: Should Lawyers Pick up the Tab?," 61 A.B.A.J. 453 (1975); Richardson, Reardon, Simeone, *supra;* Shapiro, *supra;* Smith, "Lawyers Who Take Must—At Least a Bit," 1 J. Legal Profession 27 (1976); Note, "Court Appointment of Attorneys in Civil Cases: The Constitutionality of Uncompensated Legal Assistance," 81 Colum.L.Rev. 366 (1981).

*also* R. Marks, *The Lawyers, The Public, and Professional Responsibility* (1972); Martineau, *supra,* at 560.

The reasons underlying the monopoly argument are fraught with conceptual difficulties. First, no individual is personally denied the opportunity to argue his own cause. Although the complex nature of many legal issues may seem to make the presence of a person trained in law essential, anyone is free to either pursue a career in law or obtain the requisite legal knowledge. This fact has led a noted scholar in this area, Professor Geoffrey Hazard, to dismiss the monopoly argument as "absurd." *Proceedings, supra,* at 101. Second, limiting the persons who can provide services in this and other professions is not for the personal advantage of its members but rather for the protection of the public. *In re Conner,* 357 Mo. 270, 207 S.W.2d 492, 499 (1948). Third, the monopoly argument must necessarily rest upon some unstated assumption, otherwise members of all occupations licensed by the state could be compelled to render gratuitous service. *Sparks v. Parker,* 368 So.2d 528, 538 (Ala.1979) (Maddox, J., dissenting) *appeal dismissed,* 444 U.S. 803, 100 S.Ct. 22, 62 L.Ed.2d 16 (1979). Doctors, for example, might then be required to treat patients without receiving a fee.

We next examine the validity of the officer of the court doctrine. Professor Shapiro explains that "[T]o justify coerced, uncompensated legal services on the basis of a firm tradition in England and the United States is to read into that tradition a story that is not there." Shapiro, *supra,* at 753. Invoking the English tradition without a careful examination of that country's history overlooks the complexity of the history of the English legal profession.[9]

The role of the English barrister most closely resembles today's American trial attorney. Barristers have at no time in English history been treated as officers of the court.[10] These lawyers were admitted to practice by the Inns of Court and subject to the control of the Inns of Court. R. Pound, *supra,* at 99 (1953). It is doubtful whether barristers could be compelled to represent a party. *See* Shapiro, *supra,* at 742–46; Swygert, *supra,* at 1271. Some evidence suggests that barristers present in the courtroom might—on the spur of the moment—be appointed to argue a "dock brief" for a criminal defendant upon the "tendering to counsel the sum of one guinea without the intervention of a solicitor." [11] Shapiro, *supra,* at 742 (quoting Report of the Committee on Legal Aid and Legal Advice in England and Wales, Cmd. No. 6641 (1945)).

Technically, only English "attorneys" were treated as officers of the court. *See* Martineau, *supra,* at 543–44. The role of the English "attorney" has no counterpart in this country. Unlike barristers, attorneys "were admitted directly by the judges of the court" and medieval statutes gave the court direct control over these officers. *Id.* The role of the attorney, as an officer of the court, resembled the role performed by staff members in the court engaged in ministerial duties. *Id.* at 544–47. *See also* R. Pound, *supra,* at 100–01. The English legal historian Theodore Plucknett suggests that "[t]he barrister now looked upon the attorney as a superior sort of clerk; this was justifiable, for the attorneys were now regarded as technically part of the

---

**9.** To most Americans, the English lawyers are either barristers or solicitors. This is essentially the nature of modern English practice. *See generally* Megarry, "Litigation In England Today: Beneath the Surface," 62 Wash.U.L.Q. 205 (1984). Over the centuries, however, English attorneys have been given different titles and they have performed various roles.

**10.** *See* Note, *supra,* at 373.

**11.** It has been suggested that if an obligation existed to accept such appointments, then the

obligation stemmed from their position "as citizens, to defer to the commands of the King's Courts, not because of their relationship to the courts." Note, *supra,* at 374. In all probability, however, the only relevance of such appointments—if indeed they occurred—is that they served as a means for the barrister to avoid the requirement that he not have direct contact with a client. *See generally* R. Pound, *supra,* at 103–06.

clerical staff of the courts." T. Plucknett, *A Concise History of the Common Law* 226 (1956). Another commentator explains:

> attorneys were treated as officers of the court because most of them initially had some independent official status, such as that of a clerk of the court or an under-sheriff. That status not only made them subject to regulation by the court but also gave them certain privileges: freedom from other public service and being subject to suit only in their own courts, both very important privileges in medieval England, not to mention the privilege of wearing court gowns. It was a natural development that when persons who did not have one of these official court positions began to function as professional attorneys, they sought to obtain the same title and attendant privileges of the attorneys who were court officers. It soon became commonplace to refer to all professional attorneys as officers of the court whether or not they held any other official court position.

Martineau, *supra*, at 547. *See also* M. Birks, *Gentlemen of the Law* (1960). As officers of the court, attorneys fell within the purview of the privileges accorded to the court, such as being exempted from suit in another court, serving in the militia, or being compelled to hold some other office (a general obligation imposed on subjects of the King). *See Mayor of Norwich v. Bury,* 4 Burr. 2110 (1767). *See also Respublica v. Fisher & Mifflin, supra,* at 351; *Leigh's Case,* 15 Va. (1 Munf.) 468 (1810). It has been suggested that the "evidence of [these] privileges, and not the fact of court regulation or the duties of attorneys, was the basis of the title and status of officers of the court." Martineau, *supra,* at 549.

The brief in the *Dillon* case, in addition to its confused understanding of English practice, focused only on the power of the court to appoint serjeants-at-law. "[L]ittle doubt [exists] that serjeants-at-law were expected to undertake such representation when they were called to by the court." Shapiro, *supra,* at 746. The role of the serjeants-at-law also is unmatched in Amer-

ican practice. They were virtually public officials. During their prominence these lawyers were the elite among the profession—and titled the "Order of the Coif." *See* Sir Robert Megarry, "Inns Ancient and Modern," 14–23 (Seldon Society Lecture 1971). Their position was akin to holding public office:

> They constituted the elite not only among all English lawyers but among the members of the bar who tried cases in the King's courts. They had the exclusive privilege of practice in Common Pleas until the nineteenth century, they commanded much higher fees than their fellow counsel at the bar, they were chosen only after many years of practice and were initiated in an elaborate ceremony, the judges were selected exclusively from among their ranks, and they had numerous public functions to perform. Indeed the next step from serjeant to judge may well have been a less significant one. In any event, the serjeant-at-law was an "officer of the court" in the truest sense; he held "a public office," sometimes even on government salary. He has no counterpart in American practice, . . .

Shapiro, *supra,* at 746 (footnotes omitted). *See also* T. Plucknett, *supra,* at 222–23. Although no evidence suggests that serjeants-at-law were ever compelled to render gratuitous service, the expectation that they would render such service derived from their public status. *See* R. Pound, *supra,* at 83. Their privileged order was dissolved in the middle of the nineteenth century. T. Plucknett, *supra,* at 224.

It seems apparent, therefore, that we cannot transplant the English experience onto American soil, nor can we merely claim that lawyers are "officers of the court" based upon English precedent. Attempts to do so overlook the ambiguity surrounding the use of "appointed" counsel in English practice, and such attempts fail to recognize that America departed from the traditional English model for the legal profession. Unfortunately, the oft-repeated doctrine that lawyers are officers of

the court and as such may have conditions imposed by the court on their privilege to practice law has been "used as an incantation with little or no analysis of what the title means or why a particular result should flow from it." Martineau, *supra*, at 451. For these reasons, we believe that the time has come to abandon invoking the doctrine that lawyers are officers of the court—or, as some courts suggest, public officers—and lay to rest this anachronism from English legal history. In lieu of the doctrine, decisions should rest upon sound reasoning and analysis.

First, the burden imposed on attorneys in criminal cases when the early decisions were rendered was minimal:

> At one time, representing the indigent criminal defendant was a relatively simple and straightforward matter. While there were some minor technical aspects to a criminal prosecution, for all intents and purposes an attorney's duty was simply to conduct a defense at trial with the normal measure of competency.

*State ex rel. Partain v. Oakley, supra,* 227 S.E.2d at 322. The situation today, coupled with the expanded right to counsel and the increasing crime rate, is quite different:

> [C]ontemporary jurisprudence has introduced a greater degree of complexity into the representation of criminal defendants. Today, the defense lawyer in a criminal case is confronted with a myriad of fine points with which he must deal. The modern criminal lawyer must engage in complicated and detailed pretrial discovery, analysis of involved issues of search and seizure, occasional scientific jury selection, elaborate rules relating to conspiracy, and in addition must be conversant with the forensic sciences, medicine, psychiatry and other disciplines unrelated to the practice of law.

*Id.*

Second, the nature of law practice has changed dramatically over the last fifty to one hundred years. For example,

> Skyrocketing overhead costs have greatly changed the lawyer's financial picture, amounting to as much as one-half his gross income. Complicated office equipment, library expenses, staff, rent, the telephone and other expenses take their toll. In addition, time spent representing an indigent defendant is time the attorney cannot spend on more profitable matters.

*State v. McKenney,* 20 Wash.App. 797, 582 P.2d 573, 576–78 (1978). The Bar has become increasingly specialized with fewer attorneys skilled in trial practice:

> Literally thousands of our lawyers, sad to relate, never see the inside of the court room at all. Not only has the bar itself been divided into specialties but of the very small percentage of lawyers who can be said to be trial lawyers an even smaller percentage of them have developed skills in the practice of criminal prosecution and defence. It is unjust that this comparative handful of individuals should alone bear the burdens which are rightly those of all of the bar and indeed of the community and the taxpayers. The regrettably small segment of the bar which has engaged in trial work has cheerfully borne the burden of representation of indigents over the years and these lawyers are frequently those who are less able to afford that burden than some of the brothers not in trial practice. This is inequitable.
>
> . . . .
>
> We do not forget what we have said about the holdings in the great majority of other States based on the theory which we ourselves have expressed, that the bar has a duty to undertake the defence of indigents without compensation and that that obligation accompanies a license to practice at the bar. But times have changed. We do not deal with a profession where it is commonplace for a lawyer to spend one day at his office and the next in court. Our bar and its practice have become fragmented and the all purpose attorney, the skilled advocate as well as the expert in trusts, corporations and business law, is no longer with [us.]

*Abodeely v. County of Worcester, supra,* 227 N.E.2d at 489.

Third, there is little or no substantiated evidence that uncompensated appointments either were or should have been compelled in civil cases. To the contrary, the strictness with which the fee system developed during colonial times illustrates little sympathy for the pauper. *See generally* Maguire, *supra;* Silverstein, *supra.* While one author suggests that colonial records indicate that "in some instances counsel was assigned in forma pauper in civil litigation," [12] the father of modern American legal history, James Willard Hurst, contends that "[t]he common law, and in some states a few early statutes, held out to the poor the help of counsel assigned by the court. But by the later nineteenth century this practice had long fallen into disuse in civil cases." J.W. Hurst, *supra,* at 152. *See also Scott v. State,* 216 Tenn. 375, 392 S.W.2d 681, 686 (1965) (quoting Cheatham, *The Legal Profession* 513 (1955)).

Fourth, there are fewer reasons justifying imposing a mandatory obligation on attorneys in civil cases than in criminal cases. While we recognize that the demand for legal services by the indigent may be increasing while federal funds for legal service programs are dwindling, we are not convinced that compelled representation would serve the best interests of either society or clients.

The distinction between the furnishing of pro bono legal services and court compelled legal services seems to have been lost in American case law. The same principles are not applicable to both. Compelled legal service is totally inconsistent with the giving of pro bono service as a matter of professional responsibility or professional pride. The latter two involve a matter of professional choice. It is the choice that makes the rendering of the service self-fulfilling, pleasant, interesting, and successful. Compelling the service deprives the professional of the element of professional choice. The quality of the uncompensated service can be expected to decrease in al-most direct proportion to the loss of choice of the professional rendering the service.

In cases involving potential contingent fee claims, it is no more difficult for a poor or disadvantaged person to find a lawyer than it is for a well-to-do person. The ability to find a lawyer depends upon the degree of merit of the claim. *Woods v. Dugan,* 519 F.Supp. 749, 750–51 (E.D.Mo. 1981) *vacated on other grounds,* 660 F.2d 379 (8th Cir.1981); *Ferguson v. Fleck,* 480 F.Supp. 219, 222 (W.D.Mo.1979); *Davison v. Joseph Horne & Co.,* 265 F.Supp. 750, 755 (W.D.Pa.1967); *Rhodes v. Houston,* 258 F.Supp. 546, 581 (D.Neb.1966) aff'd, 418 F.2d 1309 (8th Cir.1969). The market, then, serves as a check on the litigation explosion facing society and the courts, as Judge Richard Posner explains:

> [e]ncouraging the use of retained counsel thus provides a market test of the merits of the prisoner's claim. If it is a meritorious claim there will be money in it for a lawyer; if it is not it ought not to be forced on some hapless unpaid lawyer.

*McKeever v. Israel, supra,* at 1325 (Posner, J., dissenting).

In non-fee-generating cases, there are legal aid societies, judicare programs between legal aid services and local bar associations, legal aid clinics in law schools, group legal plans, public interest groups, and dispute resolution centers. Courts and legislatures also have authorized awarding attorney's fees against the losing party in certain suits, thereby enticing an attorney who feels the case has merit to entertain the suit even if the client has insufficient funds.

While we encourage members of the bar to explore all possible avenues for assuring equal access to justice, we do not believe that courts have the inherent power in civil cases to provide the alternative of compelling representation without compensation. Since the colonial period, a lawyer's services have been recognized as a protectable property interest. It was noted in 1812 that "[i]ndustry and faculties are

**12.** Anton-Herman Chroust, 1 *The Rise of the Legal Profession in America* 44 (1965).

most valuable property in a republic." *Byrne v. Stewart, supra,* at 468. Our state constitution expressly protects an individual's services by providing "that all persons have a natural right to ... the enjoyment of the gains of their own industry." Mo. Const. art. I § 2. We will not permit the State to deprive a citizen of this constitutional right as a condition to granting a license or privilege. While nineteenth and early twentieth century cases may have suggested otherwise, a growing body of modern law persuades us that federally guaranteed constitutional rights should be accorded similar protection.[13] It is not necessary that we reach the federal question.

■ We deem it admirable for either individual attorneys or associations of attorneys to volunteer pro bono legal representation and strongly urge the continuation of such commendable practices. It is both permissible and proper for voluntary associations of attorneys to condition membership upon members doing a certain amount of pro bono representation and courts may appoint such attorneys in civil cases as well as any other attorneys who volunteer and agree to serve without compensation.[14] The courts of this state have no inherent power to appoint or compel attorneys to serve in civil actions without compensation. Providing for such representation and the funding thereof is a matter for legislative action.

Our preliminary rule is made permanent.

HIGGINS, GUNN and BILLINGS, JJ., concur.

RENDLEN, C.J., concurs in result.

DONNELLY, J., concurs in separate opinion filed.

BLACKMAR, J., dissents in separate opinion filed.

DONNELLY, Judge, concurring.

In *State ex rel. Morasch v. Kimberlin,* 654 S.W.2d 889, 891 (Mo. banc 1983), this Court held that prohibition will lie to prevent an excess of jurisdiction but "that we should not continue the unfettered use of the writ of prohibition to allow interlocutory review of trial court error."

In *State ex rel. McNary v. Hais,* 670 S.W.2d 494, 497 (Mo. banc 1984), this Court held that prohibition will lie where "[r]elators do not have adequate remedy by way of appeal."

In this case, the court has jurisdiction but there is no adequate remedy by way of appeal and, therefore, prohibition will lie.

I concur.

BLACKMAR, Judge, dissenting.

The Court acts unnecessarily and unwisely in making our provisional rule in prohibition absolute. This holding is justifiable only if it can be said that Judge Roper was utterly without authority to appoint attorney Scott as counsel for an indigent plain-

---

**13.** Justice Harlan once commented that "[w]e do not hold that lawyers, because of their special status in society, can *therefore* be deprived of constitutional rights assured to others." *Cohen v. Hurley,* 366 U.S. 117, 129–30, 81 S.Ct. 954, 961–62, 6 L.Ed.2d 156 (1960), *overruled* in *Spevack v. Klein,* 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967). Following the demise of the doctrine of unconstitutional conditions, Hale, "Unconstitutional Conditions and Constitutional Rights," 35 Colum.L.Rev. 321 (1935), the United States Supreme Court has not allowed attorneys to be deprived of certain federal constitutional rights. *See e.g., Baird v. State Bar,* 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971); *Schware v. Board of Bar Examiners,* 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957); *Konigsberg v. State Bar,* 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed.2d 810 (1957).

**14.** *Cf. Supreme Court of New Hampshire v. Piper,* —— U.S. ——, ——, 105 S.Ct. 1272, 1280, 84 L.Ed.2d 205, 53 U.S.L.W. 4238, 4242 (1985). The plan cited by the Court in *Piper* was later held procedurally defective by the Texas Attorney General. Tex.Att'y Gen. Slip Op. (No. JM-161, June 7, 1984). The difference between a mandatory pro bono program required by volunteer bar associations and that imposed by the state was acknowledged by the Florida Supreme Court, where that court observed that "numerous voluntary bar organizations throughout the state require that their members perform pro bono work. There are differences, however, between voluntary and mandatory associations." *In re Emergency Delivery of Legal Services To the Poor,* 432 So.2d 39, 41 (Fla.1983).

tiff in a civil case. I believe that our circuit courts do not lack the authority to call upon members of the bar to assist them, and that this authority does not exclude the appointment of counsel in civil cases. This case, furthermore, is presented to us on a fragmentary factual showing such as would justify our quashing the preliminary rule in the exercise of our discretion.[1]

The plaintiff in the trial court is not a personage calculated to command sympathy. He has served approximately two years of a 25 year penitentiary sentence. While being examined at the state hospital at Fulton, he stuck sharpened paper clips into his abdomen,[2] so that surgical removal was required. He now seeks to maintain a claim against the operating surgeons for malpractice in leaving permanent stitches in the incision. Yet we should not let this plaintiff's apparent delinquencies lead us into a decision which may have adverse consequences for all indigent persons. We should bear in mind Justice O'Connor's recent warning in *Hudson v. Palmer,* ——— U.S. ———, 104 S.Ct. 3194, 3205, 82 L.Ed.2d 393 (1984), as follows:

> The courts of this country quite properly share the responsibility for protecting the constitutional rights of those imprisoned for the commission of crimes against society. Thus, when a prisoner's property is wrongfully destroyed, the courts must ensure that the prisoner, no less than any other person, receives just compensation....

I can appreciate the problem the relator, Scott, faces. He is selected from among all lawyers in the Thirteenth Judicial Circuit, and asked to undertake representation without fee. The record is silent, however, as to the particular demands which might be made on him. He has not been ordered to expend his own funds in the prosecution of plaintiff's claim, and undoubtedly cannot be so required.[3] He apparently has done nothing at all on account of his appointment, but rather has sued out the writ now before us, using a great deal of time which might have been devoted to the plaintiff's interest in preparing his excellent brief.[4] For reasons which follow, I am not willing to say that the Court is utterly lacking in power to make this appointment.

I am distinctly disappointed in the position taken by the Missouri Bar. I assume that the brief filed on its behalf was filed by authority of its Board of Governors. Counsel, undoubtedly unpaid, has been diligent in research, and the brief has been helpful in this respect, but the whole tenor of the brief is protection for lawyers and there is no suggestion whatsoever about how the plaintiff might receive legal assistance in presenting his claim. The brief seeks to conjure up hobgoblins, such as excess of litigation and burdens on the courts, with no attention as to the provision of equal justice under law. I had hoped for more help from the Missouri Bar in dealing with the ultimate problem of this case.[5]

We face a crisis in legal services for the indigent. I agree with the observation in the principal opinion that, because of the pressure of overhead costs, lawyers in private practice face increasing difficulty in rendering services without remuneration. At one time it was thought that legal ser-

---

1. *State ex rel. St. Louis County v. Stussie,* 556 S.W.2d 186 (Mo. banc 1977).

2. The psychiatric evaluation at Fulton seems to have been quite in order.

3. *Williamson v. Vardeman,* 674 F.2d 1211 (8th Cir.1982), and *State ex rel. Wolff v. Ruddy,* 617 S.W.2d 64 (Mo. banc 1981) hold that lawyers appointed to represent indigent criminal defendants may not be required to advance substantial expenses. The respondent's overruling of the relator's motion to advancement of expenses is not an order that counsel advance expenses.

4. The relator, in a post-hearing application, advises that he interviewed the defendant by telephone and sought to obtain medical information. I do not question his diligence. *See* Note 13.

5. I recognize the Missouri Bar's Lawyer Referral Service, which might refer the plaintiff to a lawyer who would visit with him and consider his case. It well might have put the plaintiff in touch with the Service, possibly mooting this case.

vices organizations, substantially supported by public funding, might provide services more effectively than volunteers could, but now we are told that federal expenses other than in selected categories must be cut to the bone, that the state cannot shoulder the burden because the legislature's authority to devise ways and means has been subjected to severe constitutional constraints, and that, above all, the citizenry must not be subjected to increased revenue claims. A few stalwart souls have striven to keep legal services for the poor alive, but in a precarious state and without prospect for taking on increased responsibilities.

We are told that the respondent initially appointed Mid-Missouri Legal Services to represent the plaintiff, but was informed that the "charter" of that organization precluded its handling of "fee generating" cases, which a claim for damages for malpractice presumably is. These assertions do not wholly satisfy me. Some legal services offices assume representation of an indigent, even in damage suits, if it is demonstrated that private lawyers are not willing to handle the case. The respondent might also explore the possibility of appointing one or more of the individual lawyers of the legal services organization. Their employer's time is no more sacred than that of a private practitioner. It appears at this stage, however, that no publicly financed legal services are available to the plaintiff.

The Missouri Bar, and the principal opinion, offer the plaintiff only the suggestions of Judge Posner, one of the bright new lights of jurisprudence with his theories melding law and economics. The judge suggests, in his dissenting opinion in *Merritt v. Faulkner*, 697 F.2d 761 (7th Cir. 1983), that the "market place" should determine the availability of legal services to an impoverished plaintiff in a damage suit.

If a plaintiff has a good case, he reasons, a lawyer will be willing to take the case on a contingent fee. He does not say directly, but it follows by implication that this hypothetical lawyer will advance such discovery expenses, experts' fees, and other preparation expenses,[6] so that the case may be brought on for trial or in appearance of seriousness created such as will impress the adjusters. He concludes that those who deserve legal services in damage suits can get them.

Posner's Darwinistic analysis, apparently endorsed by the principal opinion, is not wholly satisfying. The Supreme Court of the United States, in other context, has condemned an arrangement which makes the lawyer the final judge in a case with total authority to forestall further proceedings.[7] There should be some way that an indigent person who wants to make a claim may have access to a lawyer responsible to him or her, for personal professional advice. The principal opinion does not persuade me that the respondent absolutely lacks power to make an appointment.

## I.

There are circumstances which indicate that we should quash the preliminary rule, in the exercise of our discretion. Respondent's order simply appoints the relator, and nothing more. I am surprised at the selection of such an unappealing case for the rare exercise of the authority to appoint. The relator sought no less drastic relief, but attacked the respondent's order at the threshold and applied for our writ without trying to obtain a further understanding of his duties, or having even a preliminary interview with the claimant. The respondent has made no attempt to use the coercive power of the court, but has simply stood aside while the relator asks us for relief. There is at least a suspicion that

---

6. This plaintiff has no need of rent payments or grocery money sometimes advanced by counsel when a satisfactory settlement offer is not forthcoming.

7. State defendant was denied required fair procedure where appointed counsel for appeal took no action, but advised court that he found no merit on appeal. *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967).

an issue has simply been framed in the hope of obtaining our decision.

Under the circumstances it is entirely appropriate to quash the preliminary rule. If the relator is burdened further, as by a contempt citation, he may then ask for appropriate relief.

## II.

Before reaching the merits I would dispose a spurious issue. Both the relator and the Missouri Bar inflate the spectre of malpractice suits against a lawyer who undertakes representation of an indigent person, but is unsuccessful in litigation because he does not advance the funds necessary to prepare for trial as to secure expert witnesses. An appointed lawyer cannot be obliged to advance funds in a criminal case,[8] *a fortiori* there is no obligation to do so in a civil case. The failure to advance funds breaches no duty to the client, and cannot be made the subject of a civil action. The respondent *has not* ordered the relator to advance any expenses. To the extent that the Missouri Bar's brief suggests that she has, the brief is in error.

Too often the chimera of litigation is thrown out as an excuse for inaction. I agree that a lawyer may be sued for malpractice even in a case in which no fee is received, for professional duties are imposed by law and not exclusively by contract. Discussion of potential liability for malpractice for failure to advance expenses, however, has no proper part in this case.

## III.

I cannot agree with the principal opinion that the plaintiff, being a prisoner, is without the coverage of § 514.040, RSMo 1978. Section 205.590 was enacted in order to define the persons entitled to maintenance at public expense, and not to exclude anyone from possible assistance under other statutes.

My position on the coverage of § 514.040 obliges me to consider the constitutionality of that statute as against the challenges levied against it. The principal opinion has disposed of the "involuntary servitude" arguments.[9] I would also reject arguments based on taking of property and deprivation of due process of law, under the federal and state constitutions. I have found the Attorney General's brief, submitted in defense of the statute, very helpful.

As the principal opinion points out, § 514.040 has been with us since territorial days. It was on the books long before counsel in the case, and all members of the Court, were licensed to practice. Most of us probably did not know about the statute when we took our oaths, but we probably should have known of it. I would hesitate to say that the statute is unconstitutional, and that we could accept the benefits of bar membership with the reservation that this very clear statute will not be applied to us.

Our Court, for many years, has upheld the authority of trial judges to appoint counsel in criminal cases. *State ex rel. Gentry v. Becker*, 351 Mo. 769, 174 S.W.2d 181 (1943). The power was asserted, as against the constitutional challenges now made, in *State v. Green*, 470 S.W.2d 571 (Mo. banc 1971), with notice to the legislature that means of compensation would be sought if the legislature did not take appropriate action. Then in *State ex rel. Wolff v. Ruddy*, 617 S.W.2d 64 (Mo. banc 1981), the power was reasserted "without apology," when the legislature failed to authorize sufficient funding. Some states may take a contrary position, but our Court has unequivocally spoken out in favor of the power to appoint counsel.

Contrary to the position of the Missouri Bar, I see no essential difference between appointment of counsel in civil cases and criminal cases. Missouri courts here appointed counsel in criminal cases long before *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), when the

---

8.  *See,* Note 3, *supra.*

9.  *See,* Note 1, Principal Opinion.

duty to furnish counsel to criminal defendants was extremely limited.[10] If a requirement of uncompensated services in a criminal case does not constitute a "taking of property," or an "involuntary servitude," or a deprivation of due process, then it cannot be said categorically that such violations exist in civil appointments. The two kinds of cases differ in degree but not in quality.

The presence of a federal constitutional requirement for appointment of counsel in all cases in which imprisonment might be possible[11] actually strengthens the constitutional argument against appointment of uncompensated counsel. Prior appointments were justified by our courts' concern for the administration of justice. This concern extends to civil cases as well as criminal. Now the state asserts the authority to commandeer lawyers' services so that it may discharge its federal obligations without expense.

I do not approve of the practice of sponging off lawyers, but, if lawyers are to be appointed in criminal cases without compensation, as our opinions assert that they may be, I see no logical distinction which would utterly exclude civil cases. Nor, under the current state of our law, am I able to hold that a statute such as § 514.040 is facially unconstitutional.

Appointments of counsel have been handled with a degree of consensuality, in my experience. I have often served on court appointments, and I am sure that my brethren have also. When a judge said, "help me out," I really felt that I had no choice. Perhaps I had in mind the old army maxim that the commanding officer's desire is the subaltern's command. Perhaps I thought that the court could use its coercive power. I found, however, that judges were sensitive when good reason for declining appointments were advanced, and were willing to explore alternatives. By issuing our absolute writ, we strip the respondent of her bargaining power.

I would not foreclose the possibility that a court might make demands on appointed counsel which are so burdensome as to pose constitutional problems. Constitutional standards may be quantitative as well as qualitative.[12] Nothing now before us shows that any such demands have been made on the relator. I believe that the trial court has the authority to require him at least to consult with the plaintiff and to make a preliminary evaluation of his claims. If the plaintiff, as a convict, is disabled from suing except through a trustee, the relator might inquire into the possibility of appointing one. The court, at relator's request, might appoint additional counsel if a sharing of the load might help. If the case appears promising, relator might consult one of the personal injury lawyers who, Judge Posner assures us, are ever available for promising damage suits. The relator might find out whether members of the medical profession, or of medical faculties, or perhaps medical students, are willing to undertake preliminary consultation without fee. The Missouri Bar might tender its good offices in finding a lawyer willing to undertake plaintiff's representation. If, after the investigation, the relator is of the opinion that the plaintiff does not have a viable case, he might apply to the trial court for relief, just as Mid-Missouri Legal Services did.[13]

**10.** *Betts v. Brady,* 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942).

**11.** *Gideon v. Wainwright, supra, Argersinger v. Hamlin,* 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972).

**12.** *City of St. Louis v. Brune,* 466 S.W.2d 677 (Mo.1971).

**13.** Relator, in a post-hearing submission, advises us that he did make a substantial investigation, and that he concluded that the plaintiff's case was so without merit that he would not

take it on a contingent fee. He says that he felt that he should not disclose these conclusions to the trial court, because of possible prejudice to the plaintiff. I see no reason why he should not have made full disclosure. Had he done so the judge, in her discretion, might well have vacated the appointment or sought other counsel. I cannot imagine a course more detrimental to the plaintiff than the one he took. His post-opinion disclosures provide an additional reason for quashing the writ, and increase my suspicion that an issue was framed for a test case.

The respondent has not presently made any substantial demands on the relator. There is no basis for our assuming that she will do so, or that she will be deaf to claims of substantial burden. As I have said before, there is no authority for requiring the relator to undertake any substantial expenditures in the course of uncompensated representation. But I would not find unconstitutionality in requiring an appointed attorney to buy gasoline, or to pay for a few telephone calls, or to incur other minimal expenses. Attorneys appointed in criminal cases have customarily done this.

The provisions of § 514.040, RSMo 1978 that attorneys appointed shall "perform their duties in such suit without fee or reward" might not preclude an allowance for an attorney who is successful in establishing a "fund," under familiar equitable principles.[14] Or there might be an expansive definition of "costs." I mention these possibilities to show that there are numerous possibilities not presently at issue which militate against the heavy hand of the absolute writ. The provision for "service without fee or reward" was undoubtedly designed to protect counties or other governmental units against claims, and not necessarily to preclude compensation which does not come from the public coffers.

It is also appropriate to put to rest another red herring conjured by the Missouri Bars brief, in which it is suggested that

this court would be opening Pandora's Box if it should hold that indigent civil litigants had a constitutional right to free counsel.

There follows a list of frivolous actions that might be filed if the barriers were let down. The effort is misguided. No issue of constitutional right to free counsel is involved. Appointments under § 514.040 are entirely discretionary. It may not be assumed that the respondent will abuse her discretion in making appointments.

## IV.

I anticipated an argument that § 514.040 might be challenged as an invasion of the authority of the judiciary in the governance of the bar by the legislative authority, all in violation of Art. II, Sec. 1 of the Missouri Constitution. I would solve this by asserting inherent power.

In contrast to the principal opinion, I would align Missouri on the side of those who hold that there is inherent power in a trial court, in its discretion, to appoint counsel to assist a civil litigant.[15] Appointments in criminal cases have been made without express statutory authority, and represent an exercise or inherent power. The exercise of this power in civil cases differs only in degree.

I do not challenge the exhaustive historical analysis of the principal opinion. It simply discloses a difference of opinion, in which we are free to take our own position. My strong preference would be for public funding for legal services both in civil and in criminal cases. But these are not available, so the respondent must do her best with available resources, and so must this Court.

My conclusions are consistent with Art. I, Sec. 14 of the Missouri Constitution, reading as follows:

That the courts of justice shall be open to every person, and certain remedy afforded for every injury to person, property or character, and that right and justice shall be administered without sale, denial or delay.

I believe that § 514.040 is a proper measure in implementing this provision, and that the courts may also rely on their inherent power in doing so.

---

**14.** A person who succeeds in recovering or preserving a fund may demand contribution for expenses of maintaining the litigation and fees of counsel. *Franz v. Buder*, 82 F.Supp. 379 (E.D.Mo.1932).

**15.** *Ex parte Dibble*, 279 S.C. 592, 310 S.E.2d 440 (App.1983), *In re Smiley*, 36 N.Y.2d 433, 369 N.Y.S.2d 87, 330 N.E.2d 53 (1975), *Yarbrough v. Superior Court of Napa County*, 150 Cal.App.3d 388, 197 Cal.Rptr. 737 (1 Dist.1983), *In Interest of D.B.*, 385 So.2d 83 (Fla.1980), *Caron v. Betit*, 131 Vt. 53, 300 A.2d 618 (1972).

For the reasons stated, I would quash the provisional rule in prohibition.