## In re MARRIAGE OF BURNSIDE.

**Tommy BURNSIDE,**
**Petitioner–Appellant,**

v.

**Myrtle BURNSIDE,**
**Respondent–Respondent.**

No. 16123.

Missouri Court of Appeals,
Southern District,
Division Two.

Sept. 25, 1989.

Tommy Burnside, pro se.

No appearance for respondent-respondent.

HOGAN, Judge.

This appeal is taken from a decree annulling the marriage of petitioner Tommy Burnside, to whom we shall refer as the plaintiff, and Myrtle Burnside, to whom we shall refer as the defendant. Plaintiff is a convict in custody of the Department of Corrections.[1] He instituted this action in the Circuit Court of Iron County on September 14, 1987. Plaintiff's petition is a pro se pleading, but it is sufficient as a petition for dissolution of marriage. Among other things, it is averred that:

"6. There is [sic] substantial property rights involved in this marriage as well as contrabutions [sic] towards property rights. Petitioner has aided and contributed to real as well as personal property and as such, has an interest in such properties: 9a) [sic] one (1) house and contrabutions [sic] towards payments and upkeep on the house; (b) one (1) TV Set B & W; (c) legal papers and personal papers; family pictures; etc.; (d) gold wedding band; (e) portable typewriter; (f) one (1) stamp collection, and (g) one (1) tapeplayer [sic] and cassettes. The approximate value of the properties is $5,000 dollars that belongs to petitioner, the remainder of the estate to the respondent."

Prayer of the petition was for dissolution of the parties' marriage and "payment to the petitioner of $5,000 dollars." Clearly, the pleader's intent was to allege his marriage to the defendant and the existence of property divisible under the provisions of § 452.330, RSMo 1986.[2] Plaintiff also petitioned the court for the appointment of a trustee pursuant to § 460.010.

The defendant filed an answer admitting that plaintiff is a convict and that she and plaintiff were married February 16, 1982, in Cole County, Missouri. Plaintiff's allegation that there was property subject to distribution under § 452.330 was denied.

Defendant also filed a cross-petition averring that on February 16, 1982, she did, in good faith, marry the plaintiff, believing that plaintiff was "legally free and competent to contract." Thereafter, it was averred, the defendant discovered that plaintiff was a convict under sentence and was therefore legally incapable of entering into a marriage or any other kind of contract. Further alleging that the marriage was never consummated, the defendant prayed for an annulment. The plaintiff filed an answer to the cross-petition for annulment.

■ We have been furnished with a voluminous legal file which is not properly correlated and a 4½–page transcript of the hearing. Interrogatories were filed and answered, but the answers were never offered in evidence. Answers to interrogatories are not part of the pleadings and are not considered evidence unless they are introduced as such at the trial. *Bracey v. Grenoble*, 494 F.2d 566, 570, n. 7 (3d Cir. 1974); *Bowles v. Safeway Stores*, 4 F.R.D. 469, 471[7,8] (W.D.Mo.1945); 8 C. Wright and A. Miller, Federal Practice and Procedure § 2180, p. 572 (1970). Requests for admissions were filed by the plaintiff, but the defendant's answers are point-blank denials and are not helpful on this appeal. In determining the factual background of the case, we are remitted to the 4½–page trial transcript and the decree rendered by the court.

It stands uncontroverted that at the time the marriage ceremony took place, the plaintiff was an incarcerated convict. The defendant testified that she was presently married to the plaintiff; that he was "an inmate [of] the Missouri Department of Corrections," and that she married the plaintiff at the Missouri State Penitentiary at Jefferson City, Missouri, on February 16, 1982. The defendant further testified that when she married the plaintiff, she believed he was "legally free and competent to contract the bonds of matrimony."

---

1. Properly, the Department of Corrections and Human Resources.

2. References to statutes and rules are to RSMo 1986 and V.A.M.R., except where otherwise noted.

The defendant and plaintiff had never lived together as husband and wife, and defendant had never had sexual relations with the plaintiff.

The defendant testified that she and the plaintiff had acquired no property "together." At the time the parties were married, defendant was making payments on a house, and thereafter received a deed to the property, but the parties had not, in counsel's words, "put funds together to purchase any property." The defendant had only a few items of personal property in her possession which belonged to the plaintiff. At the time of trial, the defendant was 42 years of age and the plaintiff was about 44. At the close of the defendant's evidence, the court announced:

"... After hearing the testimony on the [defendant's] Cross–Petition for Annulment, the Court finds that the allegations in the Cross–Petition are true. Ordered, adjudged and decreed that the marriage of Petitioner and Respondent is declared by this Court to be null and void and of no legal force and effect whatsoever."

In its decree, the trial court found: 1) that on February 16, 1982, the plaintiff, Tommy Edward Burnside, was serving a term in the Missouri State Penitentiary, and was therefore legally incapable of entering into a marriage or any other kind of contract; 2) that the parties had never lived together as husband and wife, and 3) that the marriage had never been legally consummated. The appeal is taken from that decree.

■ We are first obliged to determine whether a final and appealable judgment has been entered. We take it that under the present law, as under the former statutes, it was proper to file the action for annulment as a cross-petition to the petition for divorce. See *Coates v. Coates*, 650 S.W.2d 307, 308–309[1] (Mo.App.1983). The trial court found, for the reasons noted, that there was no marriage to dissolve. Because the issues tendered by the petition were predicated on the existence of a valid marriage, the judgment rendered necessarily excluded and effectively disposed of those issues not specifically adjudged and the judgment is therefore final and appealable. *Skatoff v. Alfend*, 411 S.W.2d 169, 173 (Mo.1966); *State ex rel. Igoe v. Bradford*, 611 S.W.2d 343, 351[17] (Mo.App. 1980); *J.G. Jackson Associates v. Mosley*, 308 S.W.2d 774, 776–77[1, 2] (Mo.App.1958). Having said as much, we should note that we undertake only to dispose of those issues essential and necessary to a disposition of the appeal. In our view, there was a valid marriage and the parties are entitled to the protection of a decree declaring their rights, particularly as to that property which could conceivably be marital property.

For many years, Missouri had what is commonly called a "civil death" statute. In the statutory revision of 1969, this statute appeared as § 222.010, and provided, among other things, that a sentence to imprisonment in a state penal institution suspended all civil rights of the person so sentenced during the term of his or her imprisonment. The statute was held unconstitutional in *Thompson v. Bond*, 421 F.Supp. 878 (W.D.Mo.1976), and when the present Criminal Code was adopted in 1977, it was replaced by present § 561.016. While former § 222.010 was in effect, it was construed to prevent a convict from contracting a valid marriage. *Jandro v. Jandro*, 246 S.W. 609, 610[2] (Mo.App. 1923). The trial court's judgment clearly demonstrates it believed the parties' marriage was invalid because: a) the plaintiff was a convict, incapable of contracting a valid marriage, and b) the marriage had never been legally consummated.

■ The court erred in its declaration and application of the law. A discussion of a state's power to regulate marriage would be inappropriate in this opinion,[3] but it appears there is some order of constitutional right to marry, and that right survives incarceration. In *Turner v. Safley*, 482

---

**3.** See, generally, Annot, 96 L.Ed.2d 716, 718–20 (1989); 1 H. Clark, Domestic Relations § 2.2, pp. 82–85 (1987).

U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), a Missouri prison inmate challenged a prison regulation which permitted an inmate to marry only with the prison superintendent's permission, which was withheld unless there were "compelling reasons" to allow the inmate to marry. Testimony indicated that only a pregnancy or the birth of an illegitimate child would be considered "compelling" reasons.

The Supreme Court of the United States held the regulation was invalid. In rationalizing its opinion, the court stated:

"In support of the marriage regulation, petitioners first suggest that the rule does not deprive prisoners of a constitutionally protected right. They concede that the decision to marry is a fundamental right under *Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1976), and *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), but they imply that a different rule should obtain 'in ... a prison forum.' ... Petitioners then argue that even if the regulation burdens inmates' constitutional rights, the restriction should be tested under a reasonableness standard. They urge that the restriction is reasonably related to legitimate security and rehabilitation concerns.

We disagree with petitioners that *Zablocki* does not apply to prison inmates. *It is settled that a prison inmate 're-tains those [constitutional] rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.' Pell v. Procunier,* 417 U.S. [817], at 822, 94 S.Ct. [2800], at 2804 [41 L.Ed.2d 495]. *The right to marry, like many other rights, is subject to substantial restrictions as a result of incarceration. Many important attributes of marriage remain, however, after taking into account the limitations imposed by prison life. First, inmate marriages, like others, are expressions of emotional support and public commitment. These elements are an important and significant aspect of the marital relationship. In addition, many religions recognize marriage as having spiritual significance; for some inmates and their spouses, therefore, the commitment of marriage may be an exercise of religious faith as well as an expression of personal dedication. Third, most inmates eventually will be released by parole or commutation, and therefore most inmate marriages are formed in the expectation that they ultimately will be fully consummated. Finally, marital status often is a precondition to the receipt of government benefits (e.g., Social Security benefits), property rights (e.g., tenancy by the entirety, inheritance rights), and other, less tangible benefits (e.g., legitimation of children born out of wedlock). These incidents of marriage, like the religious and personal aspects of the marriage commitment, are unaffected by the fact of confinement or the pursuit of legitimate corrections goals.*

Taken together, we conclude that these remaining elements are sufficient to form a constitutionally protected marital relationship in the prison context. Our decision in *Butler v. Wilson,* 415 U.S. 953, 94 S.Ct. 1479, 39 L.Ed.2d 569 (1974), summarily affirming *Johnson v. Rockefeller,* 365 F.Supp. 377 (SDNY 1973), is not to the contrary. That case involved a prohibition on marriage only for inmates sentenced to life imprisonment; and, importantly, denial of the right was part of the punishment for crime...." (Emphasis added.)

*Turner v. Safley,* 482 U.S. at 94–96, 107 S.Ct. at 2265. Manifestly, the trial court's conclusion that the parties' marriage was void because the plaintiff could not contract a valid marriage was incorrect.

 Likewise, the court incorrectly assumed that the marriage was void because it had not been consummated. This marriage appears to have been a ceremonial marriage which took place in the State penitentiary at Jefferson City. A ceremonial marriage is valid notwithstanding that it is not consummated by coition. *Robertson v. Robertson,* 262 Ala. 114, 77 So.2d 373, 374 (1955); *Berdikas v. Berdikas,* 54 Del. 297, 178 A.2d 468, 469–70[3] (Super.

1962); *Mitchell v. Mitchell,* 136 Me. 406, 11 A.2d 898, 906[28] (1940); *In re Zanfino's Estate,* 375 Pa. 501, 100 A.2d 60, 61[1–3] (1953); 1 H. Clark, Domestic Relations § 2.3, p. 93. The annulment cannot be upheld upon the grounds stated by the trial court. This court has held that the burden of proving the invalidity of a marriage rests upon him who asserts such invalidity, and a marriage will not be declared invalid except upon clear, cogent and convincing proof. *Forbis v. Forbis,* 274 S.W.2d 800, 806 (Mo.App.1955). There is no evidence in the record before us which would warrant an annulment. The judgment must be reversed for that reason.

■ The plaintiff has raised a number of procedural questions. Upon the record presented, this court cannot confidently say whether a trustee should be appointed for the plaintiff because it does not appear that he has any property interests to be protected. If there is any indication, aside from plaintiff's bald assertion, that he has some property interest which may be affected by the outcome of the dissolution proceeding, then a trustee should be appointed pursuant to § 460.010. See *McLaughlin v. McLaughlin,* 228 Mo. 635, 129 S.W. 21 (1910); *American Family Mut. Ins. Co. v. Mason,* 702 S.W.2d 848 (Mo.App.1985). It has been held, of course, that a court has no inherent power to appoint attorneys for convicts to serve in civil actions without compensation. *State ex rel. Scott v. Roper,* 688 S.W.2d 757, 52 A.L.R.4th 1031 (Mo. banc 1985). Whether the plaintiff should be allowed to appear personally is a matter which rests in the sound discretion of the trial court. That discretion should be exercised after balancing the interests of the prisoner against the interests of other parties and the State, including the authorities having custody of the prisoner. The plaintiff has no absolute right to appear personally. *Strube v. Strube,* 158 Ariz. 602, 764 P.2d 731, 734–35[4] (1988); *Hall v. Hall,* 128 Mich.App. 757, 341 N.W.2d 206, 209[4] (1983).

Emphasizing that our holding is only a ruling that the record does not warrant a decree of annulment, the cause is reversed and remanded.

FLANIGAN, P.J., and PREWITT, J., concur.