**In re the ESTATE OF Edmond Esthel LUCAS.**

**Wynaka LUCAS, Petitioner–Appellant,**

**v.**

**Ruth LUCAS, Respondent–Respondent.**

**No. 19957.**

Missouri Court of Appeals,
Southern District,
Division One.

Oct. 12, 1995.

James R. Fossard, Pratt, Fossard and Rahmeyer, Springfield, for appellant.

Clifford S. Brown, Carnahan, Evans, Cantwell & Brown, P.C., Springfield, for respondent.

FLANIGAN, Judge.

The parties on this appeal are two women, each claiming to be the widow of Edmond Lucas, who died, intestate, on January 2, 1992, as a resident of Greene County. On November 17, 1992, in his estate, letters of administration were issued to the public administrator as the personal representative.

In October 1993, Wynaka Lucas filed, in the probate proceeding, an "Application for Determination of Heirship and Matrimonial Status." Several months earlier, Ruth Lucas and Wynaka Lucas, each claiming to be the surviving spouse, filed separate applications

for exempt property, § 474.250,[1] a one-year support allowance, § 474.260, and a homestead allowance, § 474.290. Ruth filed an answer to the application for determination of heirship, in which she requested that she be declared the surviving spouse.

At the evidentiary hearing held on Wynaka's application for determination of heirship, Wynaka and Ruth appeared with their respective counsel, and both sides introduced evidence. On November 8, 1994, the trial court entered a "Judgment of Matrimonial Status," in which the court decreed that Ruth is the surviving spouse of the decedent. Wynaka appeals.

Wynaka contends that she, rather than Ruth, is the surviving spouse of decedent, and the trial court erred in ruling otherwise, for four independent reasons: (a) Ruth was guilty of laches in not contesting the marriage of Edmond and Wynaka for the 24-year period of that marriage; (b) Ruth is estopped from challenging the legality of the Edmond/Wynaka marriage because of Ruth's misconduct during that marriage which was entered into in good faith and is presumptively valid; (c) Ruth did not meet her burden of proof in challenging the validity of the Edmond/Wynaka marriage; (d) Ruth constructively abandoned Edmond and had a relationship with another man for whom she bore three children, following Ruth's separation from Edmond in 1965, and Ruth, under § 474.140, should be barred from being declared to be the surviving spouse of Edmond and barred from any inheritance. This court upholds contention (c).

■■■ The initial inquiry is whether the trial court's judgment is an appealable order. The right to appeal from a probate court's judgment is purely statutory. *Matter of Walker*, 875 S.W.2d 147, 149[2] (Mo.App. 1994). Statutes relating to appeals from probate judgments are liberally construed to extend rather than restrict the right to appeal. *State ex rel. Baldwin v. Dandurand*, 785 S.W.2d 547, 549[10] (Mo.banc 1990). See also *Cooper v. Jensen*, 448 S.W.2d 308, 313[11] (Mo.App.1969).

. ■■ "The probate division of the circuit court may hear and determine all matters ... including jurisdiction of ... the determination of heirship...." § 472.020. "When used in this code, unless otherwise apparent from the context: (14) 'Heirs' means those persons, including the surviving spouse, who are entitled under the statutes of intestate succession to the real and personal property of a decedent on his death intestate." § 472.010.

Section 472.160 reads, in pertinent part:

"1. Any interested person aggrieved thereby may appeal to the appropriate appellate court from the order, judgment or decree of the probate division of the circuit court in any of the following cases:

(4) On all orders ... making allowances to the surviving spouse ...;

(13) On all orders denying any of the foregoing requested actions;

(14) In all other cases where there is a final order or judgment of the probate division of the circuit court under this code except orders admitting to or rejecting wills from probate."

A leading authority on Missouri probate law has said: "Although [§ 472.160] does not specifically state that an appeal lies from an order determining heirship in a pending estate administration, such an order, of necessity, should be deemed immediately appealable pursuant to § 472.160.1(14) in order to determine the identity of distributees and their proportionate shares prior to the time of filing the final settlement and order of distribution." Hanna–Borron, Probate Law and Practice, § 556 (1988).

In *Matter of Jellech*, 854 S.W.2d 828 (Mo. App.1993), the court entertained an appeal from the order of the trial court denying a surviving spouse's application for statutory allowances. A similar appeal was entertained in *Heil v. Shriners' Hospital for Crippled Children*, 365 S.W.2d 736 (Mo.App. 1963).

---

1. All references to statutes are to RSMo 1994, V.A.M.S., and all references to rules are to Missouri Rules of Court, V.A.M.R.

Although the trial court has not ruled on the respective applications of Wynaka and Ruth for the mentioned statutory allowances and the rights of inheritance of either as surviving spouse of decedent, the trial court's judgment has the effect of denying Wynaka's application and of making Ruth, rather than Wynaka, an heir of decedent. This court holds that the instant judgment is appealable.

On April 1, 1946, decedent married respondent Ruth. On February 7, 1957, a California court entered an "Interlocutory Judgment and Decree of Divorce," in a proceeding instituted by Ruth against her husband. The decree recited: "This is NOT a judgment of divorce. The parties are still husband and wife and will be until a final judgment of divorce is entered. This can not be done until one year after the entry of this interlocutory judgment and decree. Final judgment will not be granted unless requested by one of the parties. A marriage anywhere before the final judgment of divorce is entered, as aforesaid, is illegal."

Shortly after the entry of that decree, Edmond and Ruth reconciled and lived together until February 1965 when they permanently separated. Children of the marriage were: Dwight Lucas (born May 30, 1949), Larry Lucas (born January 23, 1951), Barbara Lucas Blankenship (born November 3, 1954), and Deborah Lucas Parker (born November 18, 1960).

Following Ruth's separation from decedent in 1965, Ruth gave birth to three children who were born, respectively, in 1967, 1968, and 1969. The father of those children, so Ruth testified, was Lou Rayburn. Ruth testified, "Edmond Lucas was not the father of any of those children and I have never claimed that he was."

On March 2, 1968, Edmond Lucas and Wynaka underwent a marriage ceremony in Arkansas. They lived together until Edmond's death.

On November 13, 1968, in an action for child support brought by Ruth against Edmond in the Circuit Court of Greene County, Edmond was ordered to pay the sum of $50 per month for the support of Barbara Lucas. The judgment recited that Dwight Lucas and Larry Lucas had been self-supporting since 1966, and that Edmond denied the paternity of Deborah Lucas. The judgment contains the following recital: "Attorney for [Ruth] advises the court that his investigation reveals that the divorce of the parties became final in February 1958." The judgment for child support was enforced by garnishment of Edmond's wages.

At the trial in the instant proceeding, Wynaka called several witnesses, including Ruth. Ruth called her daughter, Barbara Blankenship, as a witness. The testimony included the following:

**Dwight Lucas:** I remember when my father married Wynaka. In 1967 or 1968 I resided with my father and stepmother. I never heard my mother, Ruth, say anything about being the lawful spouse of Edmond. My father was married to Wynaka and called her his wife, and she called him her husband. My mother was aware of the marriage of my father to Wynaka. I was residing with my dad, and I was bouncing back and forth from Mom and Dad from the West Coast to Springfield. I kept in touch with my mother. She gave birth to three other children, and their father was Lou Rayburn. I recall a party at my house on my 30th birthday where my mother was present with Dad and Wynaka. My mother never said anything in my presence to the effect that Dad was not lawfully married to Wynaka. We were all together and we had a good time.

**William Vaughn:** I am a nephew of Edmond Lucas. Edmond told me he was happy to be divorced from his first wife. In 1966 or 1967 I took a letter out of the mailbox. Edmond opened it up and read it. He jumped up and down and said he was happy he was rid of [Ruth].[2]

**Darrell Ray:** I am Wynaka's brother and I knew Edmond. In 1967 or 1968 I had a conversation with Edmond in which he said,

---

2. Some of the testimony of this witness concerning the incident involving the letter was elicited on cross-examination by Ruth's attorney.

"I've got what we've been waiting for, my divorce decree." He handed me what he had in his hands. I don't remember what it said. He thought he was definitely divorced. He said, "How about me marrying your sister," and I said, "It's up to her. I don't care." He said that is what they had been waiting for, his final divorce decree to come.

**Glenda Camp:** I am Edmond's sister, and I know Ruth. On several occasions Edmond told me he was divorced from Ruth. I don't believe I went to the wedding of Edmond and Wynaka, but I knew about it soon after.

**Fred Shoates:** I am Wynaka's son and I have lived with my mother and Edmond. I called Edmond "Dad." I have seen Ruth a few times when we went on a trip to California and Edmond wanted to see his daughters. A few other times we went over to my stepbrother's house when Ruth was there. Ruth never said anything to the effect that Edmond was not divorced from her. I was not present at the marriage ceremony of Edmond and my mother. I was left at my grandmother's house.

**Ruth Lucas:** My three youngest children were born in 1967, 1968 and 1969. Edmond was not the father of any of those children. I have never been divorced. I have lived in a lot of places. I keep a copy of the interlocutory decree. I have kept it for 30–some years after all these moves. I carry it around with me. In 1965 Edmond and I separated for the last time. As to when I first took up with Lou Rayburn, I first met him probably in 1966 and dated him off and on until May of 1969. As to whether I ever resided with him, he visited my home. To my knowledge there never was any action for divorce initiated by Edmond.

**Wynaka Lucas:** When Edmond and I first discussed marriage, he and I went to our family attorney, Bill Moon. Bill said he would check it and get back with us. Bill called us back to his office and handed Edmond the divorce decree, or a piece of paper, which verified that his divorce was final in 1958. Edmond and I were married on March 2, 1968, in Harrison, Arkansas. Exhibit 5 is our marriage license. At the time of our marriage Edmond had no significant property. All the property we have accumu-

lated in the last 24 years has been the result of the work of Edmond and me. We started from scratch. In 1969 we made a trip out to visit Dwight. Ruth agreed that if we came by we could have the girls for a day. Ruth said to me: "I hope that he makes you a better S.O.B. husband than he has for me. I'm glad you have him and I don't." Edmond and I owned everything jointly. In the 24 years I was married to Edmond, Ruth did nothing to assert a claim as Edmond's wife.

**Barbara Blankenship:** I am the daughter of Edmond and Ruth. They never resumed living together after 1965. In the final separation in 1965 my parents just separated. There was no talk of divorce.

■ On appellate review of the judgment in this nonjury action, this court must affirm the judgment unless there is no substantial evidence to support it, or it is against the weight of the evidence, or it erroneously declares or erroneously applies the law. *Murphy v. Carron,* 536 S.W.2d 30, 32[1] (Mo. banc 1976); Rule 73.01(c).

■ Section 474.140 provides, in pertinent part:

"If any married person voluntarily leaves his spouse and goes away and continues with an adulterer or abandons his spouse without reasonable cause and continues to live separate and apart from his spouse for one whole year next preceding his death . . . such spouse is forever barred from his inheritance rights, homestead allowance, exempt property or any statutory allowances from the estate of his spouse unless such spouse is voluntarily reconciled to him and resumes cohabitation with him."

In *Matter of Jellech,* 854 S.W.2d 828, 830[1, 2] (Mo.App.1993), the court said:

"[Section 474.140] does not qualify the term 'abandonment.' Abandonment requires 'a showing of an intention on the part of the one charged with it to give up completely the relation of husband or wife with no intention to resume it.' *In re Clark's Estate,* 213 S.W.2d 645, 650 (Mo. App.1948). Constructive abandonment is based upon a spouse's conduct, from which

the requisite intent is inferred. 'Actual' and 'constructive' are simply adjectives which describe types of abandonment, all of which are included in the generic term abandonment. We hold, therefore, that the application [of] § 474.140 includes constructive abandonment.

. . . . .

"Section 474.140 'was intended to announce a principle of sound morality and public policy.' *Heil v. Shriners' Hospital for Crippled Children*, 365 S.W.2d 736, 742 (Mo.App.1963). A spouse cannot repudiate, while his wife lives, all his marital obligations, and then take all the benefits which remain after she dies."

If Ruth were the surviving spouse of Edmond, § 474.140 would bar her from inheritance rights and statutory allowances because she abandoned him. She lived apart from him for almost 27 years and, during that time, she had three children by another man. That clearly demonstrates her abandonment and repudiation of the marriage. But this court does not hold that Ruth is the surviving spouse. The bar of the statute is not involved.

■ On March 2, 1968, Edmond and Wynaka underwent a marriage ceremony in Arkansas, as evidenced by Wynaka's Exhibit 5, their marriage license and certificate of marriage. The second marriage is presumed to be valid. *Carr v. Carr*, 232 S.W.2d 488, 489[2] (Mo.1950); *Estate of Holloway v. Whitaker*, 697 S.W.2d 551, 552[3] (Mo.App. 1985); *Matter of Estate of Warner*, 687 S.W.2d 686, 688[2] (Mo.App.1985), and thus Ruth, claiming to be the surviving spouse, had the burden of proving that the second marriage was invalid, even though that required proof of a negative fact. *Carr*, at 489[1].

"The law does not impose upon every person contracting a second marriage the necessity of preserving the evidence that the former marriage has been dissolved either by death of their former consort or by a decree of court, in order to protect themselves against a bill for a divorce. . . .

"The presumption of the validity of the last marriage may be repelled only by the most cogent and satisfactory evidence." *Carr*, at 489[3] (citations omitted).

"The invalidity of the second marriage cannot be found unless first [spouse] completes a chain of evidence which excludes every indication or suggestion which might conceivably rescue the second marriage from invalidity. This evidence must be strong, distinct, satisfactory and conclusive." *Estate of Holloway*, at 552[4] (citations omitted). To similar effect see *In re Marriage of Burnside*, 777 S.W.2d 660, 664[5] (Mo.App.1989), and *Ribas v. Stone & Webster Eng. Corp.*, 95 S.W.2d 1221, 1224[2–5] (Mo.App.1936). See, generally, 14 A.L.R.2d 7, "Presumption as to validity of second marriage."

For reasons which follow, this court holds that the marriage of Edmond and Wynaka, attacked only by Ruth, is valid because Ruth failed to maintain her burden of proving that the second marriage was invalid.

Wynaka's evidence showed the Arkansas marriage ceremony. Wynaka did not have the burden of showing that Edmond's prior marriage to Ruth had terminated. Dwight Lucas, Ruth's son, testified that Ruth knew of the Arkansas ceremony and that he never heard his mother say anything about being the lawful spouse of his father. William Vaughn and Darrell Ray both testified that Edmond told them that a paper which he held in his hand was the final divorce decree ending his marriage to Ruth. Ruth's attorney, in 1968, advised the Circuit Court of Greene County that his investigation revealed that Ruth's divorce from Edmond became final in February 1958, a year after the entry of the interlocutory decree. Ruth testified that she lived a nomadic life and carried a copy of the interlocutory decree for over 30 years. Why did she do that if it was in fact of no significance? Wynaka entered into her marriage with Edmond innocently and without any knowledge of any impediment.

Against the foregoing formidable array of evidence, Ruth presented her own testimony that to her knowledge there never was any action for divorce initiated by Edmond and that they had never been divorced. The

testimony of Barbara Blankenship, Ruth's other witness, adds little.

A divorce could have been granted to Edmond prior to his marriage to Wynaka. In view of Ruth's frequent moves, it is not unlikely that service in such a proceeding could have been obtained upon her by publication without her personal knowledge. It is significant that Ruth did not introduce court records, or the testimony of court personnel, with regard to the existence or nonexistence of divorce proceedings instituted by Edmond against Ruth in the Circuit Court of Greene County, Edmond's county of residence for many years preceding his death. There was no request by Ruth that the trial court take judicial notice of the records of the other divisions of the Circuit Court of Greene County where such records could conceivably exist. The record contains no indication that the court did take such judicial notice.

"[C]ourts in general do not take judicial notice of records in one proceeding in deciding another and different proceeding, as a party is entitled to have the merits of his case reviewed upon evidence properly introduced. *In re Drew,* 637 S.W.2d 772, 777–78 (Mo.App.1982)." *Sher v. Chand,* 889 S.W.2d 79, 84–85[14] (Mo.App.1994).

Authorities cited earlier hold that Ruth, in order to rebut the presumption of the validity of Edmond's marriage to Wynaka, had to adduce "cogent and satisfactory evidence," which was "strong, distinct and conclusive." Ruth failed to meet that burden. None of the other parties to this proceeding challenged the validity of the marriage of Edmond and Wynaka.

It is unnecessary to consider Wynaka's alternative contentions based on estoppel and laches.

This court holds that Edmond and Wynaka were married on March 2, 1968, that said marriage existed until Edmond's death on January 2, 1992, that Wynaka Lucas is the surviving spouse and an heir of Edmond, and that Ruth Lucas is not the surviving spouse or an heir of Edmond.

The judgment is reversed and the cause remanded for further proceedings consistent with this opinion.

MONTGOMERY, P.J., and GARRISON, J., concur.